Complaint against Catholic Char...

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JAN 12 PM 4: 29

NANCY M.
MAYER-WHITTINGTON
CLERK

**FILED**

JAN 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FRANCWA  SIMS

CLIENTS OF 801 EAST SHELTER, )
AND IN THE INTERESTS OF THE GENERAL PUBLIC, )
2700 Martin Luther King Avenue, SE )
Washington, DC 20032 )

　　　　　　　　Plaintiffs, )
　　　　　　　　v. )

**CATHOLIC CHARITIES,**
also known as the
CATHOLIC COMMUNITY SERVICES OF
THE ARCHDIOCESE OF WASHINGTON,
also known as the
ASSOCIATED CATHOLIC CHARITIES OF
THE ARCHDIOCESE OF WASHINGTON INCORPORATED, )
924 G Street, N.W. )
Washington, D.C. 20001, )

**HAWK ONE SECURITY INCORPORATED,**
1331 H Street N.W. )
Washington, D.C. 20005, )

)
**BRIAN WILBON,** )
in his official capacity as )
Interim Director of the )
Government of the District of Columbia )
Department of Human Services (DHS) )
64 New York Avenue, N.E., 6th Floor )
Washington, D.C. 20002, )

**DC CENTRAL KITCHEN,** )
425 2nd Street N.W. )
Washington, D.C. 20001, )

**MARTHA'S TABLE,** )
2114 14th Street N.W.

CASE NUMBER  1:07CV00198

JUDGE: Rosemary M. Collyer

DECK TYPE: Civil Rights (non-employm

DATE STAMP: 01/30/2007

C.A. No. _____

**RECEIVED**

JAN 1 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Washington, D.C. 20009,                                    )
                                                           )
**MICHAEL P. KELLY,**                                      )
in his official capacity as                                )
Executive Director of the                                  )
Government of the District of Columbia                     )
Housing Authority                                          )
1133 North Capitol Street N.E.                             )
Washington, D.C. 20002,                                    )
                                                           )
              **Defendants.**                              )

---

## CLASS ACTION COMPLAINT

### Nature of Complaint

1.     This is a class action for injunctive and declaratory relief brought on behalf of current and future clients of the Catholic Community Services of the Archdiocese of Washington ("Catholic Charities" or "CC") and other non-profit organizations and agencies contracted with the District of Columbia Department of Human Services ("DHS"), as described herein. Francwa Sims and all similarly situated clients (collectively, "Plaintiffs") of the 801 East Shelter ("801 Shelter") located at 2700 Martin Luther King Avenue S.E. Washington, D.C. 20032 have been repeatedly subjected to violations of their Equal Protection rights under the Fourth Amendment of the United States Constitution.

### Parties

2.     Defendant Catholic Community Services of the Archdiocese of Washington ("Catholic Charities" or "CC") is a non-profit, tax-exempt corporation under IRS Code § 501 (c)(3) established under the laws of the District of Columbia with offices in Washington, D.C. CC is a donor-supported organization also funded by the Catholic Church that according to their website: "goes where the need is, reaching deep into the communities we serve to bring help for today and hope for the future to the most vulnerable among us. Clients receive services at 88 locations throughout the District of Columbia and five

Maryland counties. Our approach to every situation is the same. We focus on prevention where possible, intervention when needed and advocacy when resources or opportunities are either inadequate or unfair."

3. Defendant Hawk One Security, Inc. ("Hawk One") provides security for the District of Columbia Public School system, the District of Columbia Department of Human Services ("DHS"), and all District of Columbia Government agencies.

4. Defendant District of Columbia Department of Human Services ("DHS") administers social service programs and services that primarily benefit low-income District of Columbia residents. The major programs and services are Temporary Assistance for Needy Families (TANF), Medicaid/Healthy Families, food stamps, family services, early childhood development, rehabilitation services, mental retardation and developmental disability services, and youth services.

5. Defendant DC Central Kitchen, Inc. ("DC Kitchen") "is a non-profit, tax-exempt 501(c)(3) corporation that was incorporated on July 27, 1988 and began its first phase of operations on January 20, 1989, redistributing the excess food from the Presidential inauguration." Also, according to their website, "As a community kitchen, we recycle over one ton of surplus food each day that would otherwise go to waste and turn it into 4,000 meals for the hungry in the greater Washington, DC region."

6. Defendant Martha's Table is a non-profit, tax-exempt corporation under IRS Code § 501 (c)(3) whose mission according to their website, "is to help at-risk children, youth, families and individuals in our community improve their lives through the provision of educational programs, food, clothing, and enrichment opportunities. McKenna's Wagon, our seven-days-a-week mobile soup kitchen feeds more than 1200 hungry and homeless people at many locations in Washington, DC.

7. The District of Columbia Housing Authority (DCHA) is dedicated to enhancing the quality of life in the District of Columbia by providing and effectively managing affordable housing which is

diverse, well maintained, and aesthetically pleasing for those whose circumstances prevent them from competing in the general marketplace.

The District of Columbia Housing Authority seeks to achieve the highest and best use of that housing for people of low and moderate income through the promotion of economic development and self-sufficiency opportunities and the facilitation of other supportive services.

### Class Action

8.    Catholic Charities are in violation of the "Homeless Services Reform Act of 2005" ("HSRA").

9.    Hawk One Security, Inc. ("Hawk One") has abused their authority under their contract with DHS in violating the rights of Plaintiffs under the Equal Protection rights under the Fourth Amendment of the United States Constitution. Hawk One has also assaulted and threatened Plaintiffs with physical harm. Plaintiffs belongings are being searched without probable cause.

10.    DC Central Kitchen serves food at facilities operated by Catholic Charities on a regular basis to provide meals to Plaintiffs. It being that this is done on a regular basis, there appears to be a contractual service relationship with regard to the business relations involving these two non-profit agencies.

11.    All the grant money and donations that Martha's Table receives and all they can give is a stale Bologna and cheese sandwich to a hundred people? There are times that there aren't any sandwiches at all. They also have a tendency to show up late or not at all.

12.    Catholic Charities claims that the 801 Shelter is an "emergency shelter". According to the HSRA, no such term exists. The following terms are specified:

Section 2-21. "Hypothermia shelter" a public or private building that the District shall make available, for the purpose of providing shelter to individuals or families who are homeless and cannot access other shelter, whenever the actual or forecast-ed temperature, including

the wind chill factor, falls below 32 degrees Fahrenheit.

Section 13-36. "severe weather shelter" means hypothermia shelter.

The term "overnight emergency shelter" is specified in "The Winter Plan" prepared by DHS and the Community Partnership for the Prevention of Homelessness, and also listed as 12-Hour Emergency Shelters. Under daily experience, no matter how severe the weather conditions are outside, from 7:00 AM to 7:00 PM, everyday, no matter what, the Plaintiffs must leave the shelter. When it is real cold outside, Plaintiffs have to wait outside. Even before 7:00 PM, Plaintiffs must wait at the gate outside even when there are severe conditions.

The most important part of this factor is that we have to wait outside in inclement weather until security (Hawk One) shows up.

13.     Hawk One does not have communication with the 801 Shelter. There have been incidents where Plaintiffs have not been let in because of misinformation. The shelter may have beds available, but no Plaintiff can get in because Hawk One has orders to lock the gate at 9:00 PM. Hawk One officers at the gate claim that they don't have phones to call the 801 shelter, but they carry cellular phones and radios. At 5:00 AM, Plaintiffs are allowed to enter the shelter, but when you try to enter, Hawk One says you must enter at 5:30 AM. When you tell them that they are wrong, they threaten Plaintiffs with physical harm and to bar Plaintiffs from the premises. The facility does not close until 8:00 AM, but the Plaintiffs must vacate the premises at 7:00 AM. This is only so that Hawk One can leave early, yet they can come constantly late for their shift, delaying the entry of the Plaintiffs into the 801 Shelter. Then they sit down and take their thirty minute break, further delaying entry into the shelter while the Plaintiffs wait outside in the cold. Also, Hawk One officers are known to fall asleep in the security booth at night. Hawk One employees have shown that they are irresponsible and do not care about the safety of the Plaintiffs. One of the officers has been quoted as saying, "You all have to get out of here, so we can get home to feed

our cats." It is evident that Hawk One gives more priority to their pets than the Plaintiffs.

14.    Why does Hawk One have female officers working in a male shelter? At the Blue Plains shelter, also known as "D.C. Village", all the security officers are female. Yet at the 801 Shelter these female guards think that their .38 "midnight special" gun and billy club are enough to protect them from about two hundred men. Their nasty attitude, negative disposition, lack of compassion, impatience and rude demeanor causes conflict and are a distraction to the Plaintiffs who are trying to obtain housing.

15.    The air conditioning is on in the shower areas in the winter. It has been in operation for the last three months (since October 2006). From the director on down, nobody seems to know where the keys are to turn it on or off. Plaintiffs are catching colds, flu and pneumonia after they step out of the shower.

16.    For taking authoritative action against the 801 Shelter, Plaintiffs risk getting barred from the premises.

17.    There are no programs to help find permanent housing. There are no job search/placement programs. Plaintiffs can't get any transportation assistance in the form of Metrobus or Metrorail fares.

18.    It is estimated that everyday eighteen people without medical insurance are released into the shelter. There is no adequate medical care or follow-up provided or after care for people that are released from area hospitals.

19.    The food served by DC Central Kitchen is not being handled licensed by food service staff.

20.    Catholic Charities has violated Homeless Services Reform Act of 2005 to provide sanitary conditions of the restroom areas, shower areas, dining room areas, and dorm sleeping areas. The mattresses in the dorm sleeping areas are unclean. The floors are not cleaned daily. The staff when they do clean after plaintiffs leave, take plaintiff's clothes and throw them away. No one has any blankets and we have to use sheets with rips and holes in them.

## CAUSE OF ACTION

### Violation of the "Homeless Services Reform Act of 2005" ("HSRA")

21.     Plaintiff repeats and realleges paragraphs 1-20.

22.     Hawk One and Catholic Charities has no right to search Plaintiff's property, especially without their consent. Refusal to be searched should not be a bar to entry into the shelter. To do otherwise is a violation of the Fourth Amendment. Hawk One is searching Plaintiffs belongings without probable cause. In State of New Jersey vs. SJ Courty, "consent searches" during traffic stops , where individuals are asked for consent to search themselves of their vehicles are unconstitutional without reasonable, articulate, suspicion, of a crime. On this note, when Plaintiffs open their luggage to give our consent to be searched by Hawk One and CC Staff, Plaintiffs are being unjustly harassed without probable cause of any crime being committed.

This is a shelter, not a halfway house or anything pertaining to a prison institution. Therefore, Plaintiffs think  that Hawk One is superseding their authority against the Fourth Amendment of the Constitution of the United States and the decisions of the Supreme Court of the United States.

23.     Hawk One has no right to abuse its authority by physically harming and/or threatening anyone.

24.     CC should provide basic essentials such as toilet paper, cups, and clean, sanitary and safe facilities under the HSRA.

25.     CC has no exit program for Plaintiffs to leave the shelter. No affordable housing program, no medical program, no job program, or anything.

26.     There should be a food provider that provides well-cooked, properly prepared, nutritious food with fresh ingredients. D.C. Central Kitchen is not that provider.

27.     Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the most recent annual reports and data etc. provided by the Defendant as part of the investigation.

28.    DC Housing Authority always claims that there are 50,000 names ahead of each applicant for housing assistance. And that there is no more affordable or public housing being built.

29.    Where are the taxpayer's money going to?

## Requested Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgement for Plaintiffs and award the following relief:

(a)    The Mayor of the District of Columbia under the provisions specified in the HSRA must take an active role. This is not the current mayor's problem. He has inherited this system from the previous mayor.

(b)    It is estimated that the District of Columbia and the Federal Government are jointly spending at least $186 dollars per person to provide basic needs under the HSRA. Catholic Charities, D.C. Central Kitchen, and Martha's Table needs to be closely monitored and investigated.

(c)    A permanent injunction prohibiting Hawk One, as under contract of DHS, and their employees, agents, officers, representatives, servants and Catholic Charities staff from violating the Fourth Amendment rights and threatening the safety of the Plaintiffs.

(d)    An investigation into the finances and practices of Catholic Charities, Martha's Table, D.C. Central Kitchen and Hawk One Security, Inc.

(e)    Provide for expeditious proceedings in this action.

(f)    An award to Plaintiffs of attorney's fees and for costs of suit; and

(g)    An award of such other relief and compensation as the Court may deem just and proper.

Respectfully submitted,

*pro se*

Francwa Sims

1355 New York Avenue NE

Washington, DC 20002

# PETITION FOR REDRESS OF GRIEVANCES RELATING TO "CATHOLIC CHARITIES" AND "HAWK SECURITY, INC."

We the undersigned (and all others situated) of the 801 East Shelter, located at 2700 Martin Luther King Avenue S.E. Building No. 801-East, Washington, D.C. exercise our First Amendment right "to petition the Government for a redress of grievances."

We hereby Petition the Government of the District of Columbia and other non-profit organizations and associated agencies contracted with the District of Columbia Department of Human Services ("DHS") for a redress of grievances relating the inhumane, disrespectful treatment and unsanitary conditions of the 801 East Shelter caused by Catholic Charities, and Hawk One Security, Inc.

The Constitution of the United States of America guarantees to every American citizen and to those lawfully on our soil, the right to privacy, freedom from unreasonable searches and to due process of law, and

The Constitution guarantees each and every American citizen the unalienable right to life, liberty, and property, and

The homeless and poor displaced residents of the District of Columbia are American citizens, therefore Citizens of the United States, and

Every American citizen has an unalienable right to freedom from a government that would infringe or erode the unalienable rights to privacy, due process, freedom of association, freedom of information, freedom of speech, right to legal representation, freedom from unreasonable searches, right to a speedy and public trial, and right to liberty, now

Catholic Charities and Hawk One Security, Inc. under contract with the District of Columbia Department of Human Services ("DHS") are in violation of the Fourth Amendment of the Constitution of the United States of America and,

Catholic Charities are in violation of the Homeless Services Reform Act of 2005 for the staff are not "Appropriately trained and qualified", "Culturally competent" and they do not provide "Supportive services" and,

Hawk One Security, Inc, has abused their authority under their contract with the District of Columbia Department of Human Services ("DHS") has violated of the Fourth Amendment right to freedom from unreasonable searches and rights to privacy, and threatening the safety of the clients,

07 0198

Catholic Charities are has violated Homeless Services Reform Act of 2005 to provide sanitary conditions of the restroom areas, shower areas, dining room areas, and dorm sleeping areas,

The mattresses used in the dorm sleeping areas are properly cleaned of lice and fungus, etc., **FILED**

The food served by DC Central Kitchen is not being handled by licensed food service staff, JAN 3 0 2007

Respectfully submitted this 4 day of January, 2007 by: (signatures on subsequent pages attached)

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Respectfully submitted this 4th day of 2000 (Names are transcribed from original petition)

| First Name | Last Name | First Name | Last Name |
|---|---|---|---|
| 1. Anthony | Faine | 30. | |
| 2. Theo | Young | 31. | |
| 3. Nathan | Fraztoea? | 32. | |
| 4. Clyde | Spencer | 33. | |
| 5. David | Nelson | 34. | |
| 6. Mike | Harper | 35. | |
| 7. Amet? | Moore | 36. | |
| 8. Rand | Thomas | 37. | |
| 9. Anthony | Jackson | 38. | |
| 10. Dr. Michael Alle? | Lee | 39. | |
| 11. Michael | Barnes | 40. | |
| 12. Donald | Epps | 41. | |
| 13. Donnell | Underwood | 42. | |
| 14. Brian | Watson | 43. | |
| 15. Darren | Page | 44. | |
| 16. Anthony | Seabrooks | 45. | |
| 17. Francwa | Sims | 46. | |
| 18. David | Marhey | 47. | |
| 19. Smiley | Brown? | 48. | |
| 20. | | 49. | |

| First Name | Last Name | First Name | Last Name |
|---|---|---|---|
| 21. | | 50. | |
| 22. | | 51. | |
| 23. | | 52. | |
| 24. | | 53. | |
| 25. | | 54. | |
| 26. | | 55. | |
| 27. | | 56. | |
| 28. | | 57. | |
| 29. | | 58. | |
| 30. | | 59. | |
| 31. | | 60. | |
| 32. | | 61. | |
| 23. | | 62. | |
| 24. | | 63. | |
| 25. | | 64. | |

26.

27.

28.

29.

65.

66.

67.

68.

THE VAULTS OF

# EROWID

◄ About Erowid
◄ Join / Donate

Plants & Drugs ▼    Mind & Spirit ▼    Freedom & Law ▼    Culture & Art ▼    Library ▼

Path :  freedom > courts

**Donate $125 and receive a beautiful hand-made glass molecule.
(Choose from molecules such as DMT, MDMA, or Psilocin).**

# The 4th Amendment
## and Related Supreme Court Decisions

**by Erowid**
**June 15, 1999**

The Supreme Court's decisions regarding how the State and its law enforcement officers may invade the privacy of individuals play a key role in the interactions between private citizen and police.

## Amendment IV of the Federal Constitution - "The Right to Privacy"

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## Pro Privacy Decisions

Lawrence v. Texas, 02-102 June 23, 2003
[6-3 : Kennedy, O'Connor, Souter, Ginsburg, Stevens / Scalia, Thomas, Rehnquist]
After a police officer finds two men having sex together in their home, they are charged with violating Texas's laws against homosexual sex. The Court ruled that the Texas laws were invalid because they violated the Equal Protection Clause by criminalizing conduct among disapproved sub-populations (the same act would have been legal for a heterosexual couple) and most of the majority (excluding O'Connor) found that there was a 4th Amendment privacy protection for intimate, private, consensual, adult acts.

**Minnesota State ONLY**: Minnesota State vs Fort, May 1, 2003.
Minnesota Supreme Court rules that "consent searches" during traffic stops are unconstitutional because they violate the requirement that searches be reasonable. Searches without reasonable, articulable suspicion of criminal activity are banned.

**Illinois Supreme Court Only** : Illinois vs Cox, Dec 2002
Illinois State Supreme Court blocks a search pursuant to a dog sniff after a traffic stop. Although the decision is confusingly argued, they appear to invalidate suspicionless dog sniff searches:
"Moreover, were we to accept the State's contention that the dog-sniff test was permissible, we would be endorsing a drug-sniff test at every stop for a traffic violation... In sum, Officer McCormick did not have "specific and articulable facts which, taken together with rational inferences therefrom," reasonably warranted an extended detention of defendant's vehicle, and the ensuing drug-sniff test. He did not have even a hunch that defendant was engaged in criminal activity to support the call to Deputy Zola. Given these circumstances, if we held that Officer McCormick was justified in calling the canine unit, we would clearly support the view that police officers can resort to the use of canine units at every traffic stop."

**New Jersey State ONLY**: State of New Jersey vs SJ Courty, March 4 2002.
[5-0: Coleman J, Chief Justice Poritz DT, Long V, & Zazzali JR with Stein J concurring.]
New Jersey state Supreme Court found that "consent searches" during traffic stops, where

individuals are asked for consent to search themselves or their vehicles are unconstitutional without reasonable, articulable suspicion of a crime.

### KYLLO v. UNITED STATES (99-8508) 190 F.3d 1041 June 11, 2001
[5-4 : Scalia, Souter, Thomas, Ginsburg, Breyer / Stevens, Rehnquist, OConnor, Kennedy]
After suspecting Kyllo of growing cannabis, police officers scanned his home with infra-red imaging equipment and found a suspicious heat signature on a wall of his garage. They used this evidence to get a search warrant, which led to his conviction for growing cannabis. The Supreme Court ruled that infrared imaging of homes (or other high-tech scanning) is unconstitutional without a warrant.

### Ferguson v City of Charleston (99-936) 186 F.3d 469: March 21, 2001
The Court stopped a South Carolina hospital from secretly drug testing pregnant women and turning over the results to the police.

### INDIANAPOLIS v. EDMOND (99-1030) 183 F.3d 659: November 28, 2000
The Court stopped Indiana from setting up roadblocks for the explicit purpose of warrantless drug searches.

### KNOWLES v. IOWA (000 U.S. 97-7597) : December 8, 1998 (9-0)
The Court cancelled an Iowa state law that gives "officers authority to conduct a full-blown search of an automobile and driver where they issue a citation instead of making a custodial arrest." In this case a man was pulled over for speeding and without his consent his car and person were fully searched. The court ruled this to be an unacceptable breach of the 4th Amendment protection against unreasonable searches.

### MINNESOTA v. DICKERSON (508 U.S. 366) : June 7, 1993 (7-2)
A key decision disallowing weapons searches resulting in finding non-weapon contraband. A man stopped for being in a suspicious area is given a "Terry Patdown" (weapons search) and found to have some small thing in his pocket, which the policeman removed and found to be a crack-rock. The Supreme Court ruled that the in order to determine whether the item was crack or not required a further, unwarranted search and was not acceptable by 4th Amendment standards.

### MINNESOTA v. OLSON (495 U.S. 91) : April 18, 1990 (7-2)
A decision finding that guests in homes have constitutional privacy protections. In this case the defendant was staying with a friend when the police arrived and surrounded the home on a sunday afternoon. The police phoned the home and the resident told the police the defendant wasn't there after which the police burst into the home to find the defendant hiding in a closet. The Supreme Court ruled that breaking into the home without a warrant was unlawful.

### ARIZONA v. HICKS : March 3, 1987 (6-3)
A decision to require probable cause for searches, continuing the strong 4th Amendment standard which requires more than just suspicion to allow a search. In this case, the police had lawfully entered an apartment and saw an expensive stereo, which an officer assumed to be stolen because of the neighborhood and other contributing factors (a shotgun and black mask in the room). The police proceeded to move and search the stereo for serial numbers, which they discovered were stolen. The Court ruled that the police officer's acts with the stereo constituted a search and the police would need to meet the "probable cause" standard in order to lawfully conduct a search of the private equipment.

### YBARRA v. ILLINOIS (444 U.S. 85) : November 28, 1979 (6-3)
Another decision making clear that a Terry Search for weapons cannot be used as a pretext for continued searching of a person. The case of a man who was in a bar that was being legally searched by police for heroin. He was patted for weapons as were all the other patrons in the bar and was found to have "a cigarette pack with objects in it" in his pants pocket. The police pulled the cigarette pack from his pocket and found heroin. The Supreme Court ruled that this was an unreasonable search and seizure.

Searches for weapons should always be predicated on a reasonable belief that a suspect may be threatening. "The Terry case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain.'6 Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find

weapons that he reasonably believes or suspects are then in possession of the person he has accosted. Nothing in Terry can be understood to allow a generalized [444 U.S. 85, 94] 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." Justice Stewart, YBARRA v. ILLINOIS, 444 U.S. 85 (1979)

## Anti Privacy Decisions

ILLINOIS v. CABBALES (03-923) : Jan 24, 2005 (6-2) A man stopped for speeding had his car sniffed by a drug dog while he was being issued a ticket, was not detained for longer than he normally would have to wait for the dog. Dog alerted on the car, the car was searched and cannabis was found in the trunk. The U.S. Court overturned the Illinois Supreme Court and found: "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."

BOARD OF EDUCATION OF POTTAWATOMIE COUNTY v. EARLS (01-332) : June 27, 2002 (5-4) Supreme Court ruled that any extracurricular activity is cause for drug testing in public schools.

ATWATER v. LAGO VISTA (99-1408) : April 24, 2001 (5-4) A woman was stopped for not wearing her seatbelt while driving with her children. The police officers "pulled Atwater over, verbally berated her, handcuffed her, placed her in his squad car, and drove her to the local police station, where she was made to remove her shoes, jewelry, and eyeglasses, and empty her pockets. Officers took her 'mug shot' and placed her, alone, in a jail cell for about an hour, after which she was taken before a magistrate and released on bond." Atwater sued, arguing that this type of treatment as unreasonable and therefore a violation of the Fourth Amendment. Souter, writing for the 5-4 majority said that the police may arrest and mistreat them at any time, so long as they have reasonable suspicion that even the smallest infraction has been committed.

FLORIDA v. WHITE (000 U.S. 98-223) : May 17, 1999 (7-2)
Two months after officers observed respondent using his car to deliver cocaine, he was arrested at work on unrelated charges. At that time, the police seized his car without securing a warrant because they believed the car was subject to forfeiture under the Florida Contraband Forfeiture Act (Act). During a subsequent inventory search, the police discovered cocaine in the car. Respondent was then charged with a state drug violation. The Court ruled in another terrible decision that police may seize a car anytime they like if they have probable cause to believe it has ever been involved in any crime. A bit of Humor by The Onion that came out soon after this decision.

WYOMING v. HOUGHTON (000 U.S. 98-184) : April 5, 1999 (6-3)
A decision allowing searches of passenger's purse with probable cause against the driver, when the passenger was not holding the purse.

MINNESOTA v. CARTER (000 U.S. 97-1147) : December 1, 1998 (6-3)
The Court made a bizarre ruling that unless guests in a home are staying over night, they have no legitimate expecation of privacy from the spying eyes of police. In this case a policeman peeked through the closed blinds into a private residence in an apartment complex and saw some people bagging white powder. The officer arrested then men as they left the building. The court held that "Any search which may have occurred did not violate their Fourth Amendment rights. Because respondents had no legitimate expectation of privacy, the Court need not decide whether the officer's observation constituted a 'search'." Ugly as hell.

MARYLAND v. WILSON (000 U.S. 98-184) : February 19, 1997
One of the recent decisions by Rehnquists fascist court allowing police to order passengers to exit a vehicles pulled over for traffic stops without even any suspicion of danger, threat, or wrongdoing. See PENNSYLVANIA v. MIMMS

FLORIDA v. BOSTICK (000 U.S. 89-1717) : June 20, 1991 (6-3)

A decision allow RM police sweeps of busses which are "recognized as "are inconvenient, intrusive, and intimidating." Despite being trapped in his seat at the back of a bus by several officers without any probable cause, the defendant should have known that he was "free to leave" and had the right to deny any and all requests by the police for information and searching his belongings.

OLIVER v. US (466 US 170) : April 17, 1984 (6-3)
In a nightmarish decision going against all reasonable standards of privacy, Reagan's fascist court ruled that police are exempt from private property trespassing restrictions and may search any area of private property, even when there are fences and No Trespassing signs, except for the area immediately around "the home".

MICHIGAN v. LONG (463 U.S. 1032) : July 6, 1983 (6-3)
The court allowed a 'weapons search' of a vehicle to as a means of 'protecting' the officers who had detained a man who had driven into a ditch and appeared intoxicated. The man's car contained a pouch of cannabis and he was arrested. The Supreme Court ruled "The circumstances of this case justified the officers in their reasonable belief that respondent posed a danger if he were permitted to reenter his vehicle. Nor did they act unreasonably in taking preventive measures to ensure that there were no other weapons within respondent's immediate grasp before permitting him to reenter his automobile. The fact that respondent was under the officers' control during the investigative stop does not render unreasonable their belief that he could injure them."

UNITED STATES v. ROSS (456 U.S. 798) : June 1, 1982 (6-3)
A huge and terrible decision by the High Court which explicitly attempted to allow searches of any containers inside any vehicle on the basis of a police officer's assertion of probable cause, totally circumventing the 4th Amendment's warrant requirement. Thurgood Marshall's dissent is extremely good.

NEW YORK v. BELTON (453 U.S. 454) : July 1, 1981 (5-4)
The court allowed an officer to unzip a zipped jacket pocket and remove the contents of the pocket from a jacket left in the backseat of a car after he had arrested the driver and passengers. The court revised the Chimel v. California standard which said that the State was allowed to search those things within immediate reach of someone when arrested. This opinion also attempted to make broad changes by saying that : "Not only may the police search the passenger compartment of the car in such circumstances, they may also examine the contents of any containers found in the passenger compartment. And such a container may be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have."

RAWLINGS v. KENTUCKY (448 U.S. 98) : June 25, 1980 (7-2)
A case where it is determined that even if a second-party's 4th Amendment rights are abridged and that breach yields evidence against the first person, that the first person has no 'standing' to prevent the use of property improperly searched. Police had a warrant to arrrest a person, but found several other people when they arrived at the location. They 'smelled marijuana' and got a second warrant to search the actual house, after which they forced a woman to empty her purse which contained a controlled substance. The defendent admitted the drugs were his. The court ruled that despite the fact that the woman had been improperly searched, resulting in materials which later were used to prosecute the defendant, that the defendant could not exclude the evidence because he had no 4th Amendment protection over someone else's purse. Very bad.

PENNSYLVANIA v. MIMMS (434 U.S. 106) : December 5, 1977 (6-3)
The court allowed an officer to routinely order all people stopped for traffic violations out of their car (and presumably all passengers) without any suspicion or cause.

TERRY v. OHIO (396 U.S. 1) : June 10, 1968
A key decision allowing officers to do weapons searches of people during any stop. The "Terry search" or "Terry pat" has become a standard for interacting with 'suspicious' people.

[ back to freedom ]   [ back to courts ]

Created by Erowid - Jun 15, 1999                    Last Mod - Jul 08, 2006

Content & design © 1995-2006 Erowid.org. Please ask before publicly reproducing.

About this Document  ▶

# THE WINTER PLAN

*PROTECTING THE LIVES OF HOMELESS PEOPLE*
*IN THE WINTER OF 2005-2006*

Prepared by:

The D.C. Department of Human Services



and

The Community Partnership
For the Prevention of Homelessness

August 18, 2005

Shelter Hotline 1-800-535-7252

## INTRODUCTION

In keeping with *Homeless No More*, the city's 10-year plan to end homelessness, this "Winter Plan of 2005-2006" reports on the outcomes of the 2004-2005 hypothermia season and the city's efforts underway to prepare for the season ahead. In the 10-year plan, the Mayor commits the city to taking care of needs as they exist now while laying the groundwork for ending homelessness as we now know it by the year 2014. This Winter Plan functions as the means to articulate and implement coordination amongst local agencies and providers within the Continuum of Care who participate in providing hypothermia shelter and services to persons who are homeless. It provides an overview of established collaborations, protocols and services coordinated by the city to respond to the needs of persons who are homeless in Washington D.C. during the winter season of 2005-2006.

In the winter of 2004-2005 the Department of Human Services (DHS), The Community Partnership for the Prevention of Homelessness (TCP) and nonprofit and government partners worked collaboratively to create the shelter facilities and services that were set forth in the 2004-2005 Winter Plan to protect the lives of Washington D.C.'s homeless. Of the 151 days in the 2004-2005 winter season that extended from November 1 to March 31, about half (72) of these days were hypothermia alert days. On these days additional shelters were opened and all permanent shelters stayed open for 24 hours.

In the winter of 2004-2005, the Hypothermia Watch Partners Campaign continued as it has for the last several years. The campaign's efforts included circulating press releases and public services announcements soliciting the public's help in identifying persons at risk. The campaign also entailed the placement of informational placards on Metro buses and distributing thousands of flyers in both English and Spanish to nonprofits and businesses, all designed to increase public awareness on how to access hypothermia shelters and services.

A Mayor's Order issued in 2001 continues to mandate the coordination of street outreach efforts so that chronically homeless persons who are disabled by substance abuse and/or mental illness, sometimes causing them to behave in a manner that puts their lives at risk, can be taken from the streets and placed in a treatment facility or shelter during a hypothermia alert. The order underpins collaboration between DHS, the Metropolitan Police Department (MPD), the Department of Mental Health (DMH), the Department of Health (DOH) and both public and private outreach programs. In addition, DHS senior staff continued last season the practice of convening a weekly phone conference with designated members of the Community Partnership, the United Planning Organization's (UPO) Shelter Hotline office, outreach providers, MPD and homeless advocate groups to assure rapid evaluation and response to hypothermia related emergencies, needs, services and alerts.

Overall hypothermia capacity in 2005 was 23% greater in 2004-2005 than it had been in 2003-2004, with a total of 1,609 beds available for adults and families brought online as the season progressed. The facilities included a "sobering center" comprised of 50 beds at D.C. General Hospital that provided detoxification and shelter services adjacent to the city's mental health crisis unit. The sobering center serves persons picked up by police and outreach workers who due to severe inebriation, remained outside in the bitter cold. D.C. Village expanded from 50 units to 68 units, while D.C. General Hospital opened its doors to 50 homeless families, bringing

the total available family units to 118. Four churches were added to the network to provide a total 100 additional beds for men during hypothermia alerts. Additionally, the Hermano Pedro shelter for women opened with a capacity of 15 beds.

The Community Partnership coordinated daily hypothermia operations in concert with city agencies and providers. The wide distribution of a daily census that illustrated capacity levels allowed stakeholders to analyze and reprogram the allocation of beds as needed by the different homeless populations of men, women and families. UPO operated the Shelter Hotline and van outreach services. The Community for Creative Nonviolence opened its drop-in center to shelter as many as 225 men. Catholic Charities operated the adult hypothermia facilities and responded rapidly to expand as conditions changed and new sites were brought on line. When established capacities were exceeded, the Coalition for the Homeless operated overflow beds at its Emery and La Casa shelters and managed an unprecedented demand for shelter by families at the Virginia Williams Family Resource Center (central intake) and D.C. Village. Families Forward, Inc. operated the D.C. General Hospital family shelter, expanding from a planned capacity of 31 units to 50 units by the end of the season. Families Forward then followed through by out-placing sheltered families into transitional and permanent housing before the facility closed at the end of the hypothermia season, in April 2005.

While the winter of 2004-2005 presented challenges, the Winter Plan provided a system of shelter and outreach services that responded accordingly. Shelters offered a warm place for those who came in from the cold, and for those who did not, outreach workers took food, blankets and supplies into the streets. As a result, the major objective of services – saving lives – was achieved as the District recorded no deaths of homeless people due to hypothermia.

The statistics for the winter of 2004-2005 that follow provide further detail on the accomplishments of the season. As we prepare for the next hypothermia season, we hope that our ability to continue to provide appropriate needs-based services and maintain good faith and responsive relationships with all hypothermia partners will be strengthened by the protocols and definitions set forth in this plan. In this and every season, the Department of Human Services and the Community Partnership are jointly grateful to their partners for collaborative efforts undertaken by all to protect the lives of homeless people.

### WINTER 2004-2005 OUTCOMES

There were 72 hypothermia alert days and nights during the 2004-2005 winter season, almost one of every two days in the 151-day period. During the period the Partnership and other publicly-funded providers operated the following:

- 1, 491 permanent year-round emergency shelter beds for adults
- 32 emergency shelter beds for youth
- Up to1,455 hypothermia beds for adults (sometimes more in overflow)
- 68 units for families with an estimated 204 beds
- An additional 50 units for families at DC Village, 10 units in Congregation-Based Shelter and 113 apartment-style units bringing total year round capacity to 688 beds for persons in families.

- A total of 3,870 emergency shelter beds for single adults, youth and persons in families with children were operating during the hypothermia season.

In addition, private shelter providers operated another 336 beds in 12 and 24-hour emergency shelters for adults, families and youth, bringing the total of emergency shelter beds available in the past winter to 4,206.

ADULTS: For February, the coldest month of the 2004-2005 seasons, a daily average of 2,001 adults were recorded as staying in the emergency shelters as reported by the census. There were as many as 241 vacant beds and as few as three 3 vacant beds in these emergency shelters throughout the month, with an average of 97 vacant beds available throughout the month. Thus, everyone who wanted to come into shelter was provided a bed.

It is not possible to get a discreet count of homeless adults served in hypothermia shelters because a positive ID is not required and often not given. As a result of the fluid nature of hypothermia shelters, people move around between shelters and get counted more than once. Despite this impediment, shelters do try to keep an accurate count of people served daily. Hypothermia facilities reported serving the following amount of people during the winter season:
- Catholic Charities reported 2,426 men and women were sheltered in the hypothermia-only facilities.
- D.C. General, Freedom Unity Church and Hermano Pedro Center reported 853 women were sheltered in their sites.
- Banneker Recreation Center, Sacred Heart Church, St. Luke's Church, Seventh Day Adventist Church and St. Aloysius Church reported serving 1,510.
- 10 other adult emergency shelters (not including the Federal City Shelter's main floors or hypothermia space) reported serving 7,996 men and women during these season.
- House of Ruth/Madison, John Young Center and the Open Door 12-hour shelter reported sheltering 1,379 women.
- 801 East Building, Crummel Trailers, Emery House, Franklin School, La Casa Multicultural, MLK Jr. Avenue trailers, and the New York Avenue Shelter reported sheltering 6,617 men.

Taking into account both the hypothermia-only and year-round shelters, about 10,420 adults were reported as sheltered. It is likely that this count is inflated due to the transient nature of the population that results in use of multiple shelters. The total unduplicated count is closer to about 8,925 men and women served. Despite these high numbers, there was room for all adults in need of shelter to be adequately served throughout the season.

FAMILIES: Family demand for shelter started at a high level and remained high throughout the past winter. The DC Village site was at capacity or over capacity on most days during the hypothermia season. As a result of the high volume, 86 families were placed at the D.C. General Hypothermia overflow shelter when there were not enough rooms at the D.C. Village Family Shelter.

SUPPLIES AND STREET OUTREACH: During hypothermia season the UPO Shelter Hotline operators recorded a total of 16,472 calls, and provided 24,781 one-way trips to shelter. Homeless persons were transported directly from the streets, hospitals, and shelters that were

filled to shelters with available beds. Additionally, between October 2004 and March 2005 UPO reported 192 (duplicate count) shelter refusals during the period. UPO distributed 9,018 blankets and 14 sleeping bags, 30 articles of rain wear, 1,565 gloves, hats and/or scarves, 95 pairs of long-john tops and bottoms, 195 pairs of socks, 27 tarps, 905 hot and cold beverages and 533 sandwiches to homeless persons living on the streets.

In addition to the UPO Shelter Hotline, there were eight outreach organizations under contract with the Partnership and four other agencies that provided street outreach this past winter. The Partnership-funded agencies reported that they assisted 146 men and 23 women. This is an unduplicated count across seven outreach agencies that recorded new contacts during the hypothermia season. However, outreach providers also reported serving 418 unduplicated persons in the period that had "open" cases – that is, persons that they see from time to time. Of these 418 individuals, outreach agencies reported that they had been actively engaged with 364 for seven months or longer. These persons identified as "open" cases likely chronically homeless and remain in the streets more often than they come into shelters.

The outreach efforts in addition to the UPO numbers indicate that multiple and repeated attempts to reach those living on the streets are succeeding even though it is impossible to convince everyone to accept shelter.

## THE NEED FOR HYPOTHERMIA SERVICES

Hypothermia is a life-threatening condition occurring when a person's body temperature goes below 95 degrees due to exposure to cold and wet conditions. It is particularly dangerous for persons who are disabled by substance abuse or mental illness and may be unaware that their body temperature has fallen to the point of danger. Many deaths on the street that occur in hypothermic conditions are associated with substance abuse, particularly alcohol which causes blood vessels at the surface of the skin to dilate and lose body heat very quickly.

Once a person is suffering from hypothermia, he or she must be removed from the street and usually requires medical intervention. At times a person at risk of becoming hypothermic will voluntarily accept help, but sometimes they must be helped involuntarily. Outreach workers are trained to recognize the symptoms of hypothermia.

**Hypothermia Season:** Hypothermia season begins November 1 and extends through March 31. The need for opening temporary hypothermia shelters increased in FY 2001 because the winter was particularly severe with 99 days of hypothermic conditions. The winter of FY 2002 was more the norm at 67 hypothermia alerts, while winter FY 2003 had 110 hypothermia alerts. The winter of FY 2005 showed a decrease with a total of 72 hypothermia alerts. For the winter of FY 2006 the District and The Community Partnership are budgeting for up to 110 days of episodic hypothermia shelter for single adult men and women and for full-time operation of an expanded DC Village facility for families.

## FY'06 HYPOTHERMIA CAPACITY CHART

| POPULATION | SITE | FY05 Hypothermia BEDS* | Operating Year-Round in FY 06 | FY 06 Hypo-thermia Beds | PROVIDER RESPONSIBLE |
|---|---|---|---|---|---|
| **Women** | DCGH Cafeteria | 75 | 75 | | Catholic Charities |
| | Freedom Unity Church | 25 | | 25 | Catholic Charities |
| | John Young | 100 | 80 | 20 | Catholic Charities |
| | Overflow – Kennedy Recreation Ctr. | 50 | | 50 | Catholic Charities |
| | Hermano Pedro Center | 15* | 10 | 5 | Catholic Charities |
| | Downtown site TBD | n/a | | 25 | |
| | **Women Total Beds** | **265*** | **290** | | |
| **Men** | 801 East Building | 200* | 208 | 80 | Catholic Charities |
| | CCNV Drop-In Center | 225 | | 135 | CCNV |
| | Overflow – Banneker Recreation Ctr. | 40** | | 40 | Catholic Charities |
| | Overflow- Crummell Trailers | | | 126 | Catholic Charities |
| | DCGH Sobering Center | 50 | | 50 | DMH |
| | Emery overflow | 30 | | n/a | Coalition for the Homeless |
| | First  Seventh Day Adventist Church | 25 | | 25 | Catholic Charities |
| | Franklin School | 170* | 240 | | Catholic Charities |
| | La Casa Overflow Trailers | 30 | 30 | | Coalition for the Homeless |
| | Overflow-Martin Luther King Trailers | | | 108 | Catholic Charities |
| | New York Avenue | 360 | 360 | | Catholic Charities |
| | Sacred Heart Church | 25 | | 25 | Catholic Charities |
| | St. Aloysius McKenna Center | 25 | | 25 | St. Aloysius |
| | St. Luke's Church | 10 | | 10 | Catholic Charities |
| | St Vincent  DePaul | 0 | | 25 | |
| | **Men Total Beds** | **1,190*** | **1,487** | | |
| **Families** | DC Village Overflow (18 units) | 54 | 54 | | Coalition for the Homeless |
| | DC Village Cottage 2B (25 Units) | 0* | | 75 | Coalition for the Homeless |
| | DCGH Overflow (50 units) | 150* | | 150 | Families Forward |
| | **Family Total** | **204*** | **279** | | |
| | **Total Beds** | **1,659*** | **2,074** | | |

* indicates that numbers in Fy05 Winter Plan table were altered to reflect changes made during the FY05 hypothermia season.
**Banneker was slated for use by women in Fy05, but was instead used for men and will be used for men again in Fy06.

# ELEMENTS OF THE WINTER PLAN

**BUDGET:** The District and The Community Partnership are budgeting approximately $1.3 million for the winter season of 2005-2006 to operate the hypothermia-season shelters detailed in the table below. Included in this $1.3 million figure are the costs of seven outreach agencies operating for five months and the UPO Shelter Hotline operations that are increased during the winter season. Not included are the costs of shelters that came on line as hypothermia shelters last year but are now operating year-round. The capacity table above separates into two columns shelters that have converted to year-round facilities and adds their inventory to the hypothermia-only shelters to provide total bed capacity for this hypothermia season.

**HOURS OF OPERATION:** Some of the shelters will open from 7:00 p.m. to 7:00 a.m. only during hypothermia alerts since they will be located in buildings that are used for other purposes during the day. Other hypothermia beds will also be available 7:00 p.m. to 7:00 a.m., but will open at the start of the season and remain open every day of the season. The 50-unit emergency facility for families at DC Village is open 24 hours a day year round, as will the additional 18 units during the winter. Likewise, the D.C. General facility will open on November 1 and be available 24 hours a day for the whole season. On days when the temperature remains below 32 degrees, persons using hypothermia shelters will be offered places to stay and keep warm within the existing emergency shelter inventory, which will remain open 24 hours a day. Past experience shows, however, that most persons will go about their daily routines. All persons in overnight emergency shelters will be informed about where they can stay warm during the day.

**SITES:** The District government will provide public buildings and enter into agreements with churches to operate the additionally needed shelter beds during the hypothermia season.

**PROVIDERS:** The United Planning Organization (UPO) will be responsible, as they have been for the last several winters, for operation of the Hypothermia Hotline and the 1-800-535-7252 number for homeless people to call for assistance. UPO provides drivers, outreach workers and the routing of vans to pick up and deliver persons to shelters.

Catholic Charities will staff three large hypothermia shelters for adults as well as four 25-bed shelters in churches. Coalition for the Homeless will operate DC Village and overflow beds at La Casa. CCNV will staff the drop-in center shelter. The Sobering Center at DC General will collaborate with DHS, the Department of Health and the Department of Mental Health. The DC General Family Site will be in operation under the management of Families Forward.

**OUTREACH AGENCIES:**
The following twelve agencies have partnered to develop strategies and means for providing outreach services during the hypothermia season and extreme weather conditions. Each agency will provide the following:

| FY'06 OUTREACH PROVIDER | AREA | SERVICES |
|---|---|---|
| Neighbor's Consejo | Ward 1 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services - with special emphasis on Latinos. |
| Charlie's Place | Ward 1, 2 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services -with special emphasis on Latinos. |
| Downtown Services Center | Ward 2 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| Rachael's Women's Center | Ward 2 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| Salvation Army Grate Patrol | Ward 2 *Downtown and Mall area* | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| Georgetown Ministry Center | Wards 2, 3 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| Miriam's Kitchen | Wards 2, 3 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| Community Council for the Homeless at Friendship Place | Ward 3 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| First Seventh-day Adventist Church | Ward 4 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| DC Central Kitchen and Clean & Sober Street: "First Helping" Program | Wards 5, 7, 8 | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation and referrals to hypothermia shelter and services. |
| Unity Health Care Medical Outreach | All areas | Street outreach, crisis intervention, provision of blankets, food, water, clothing, transportation, medical attention and referrals to emergency medical care or hypothermia shelter and services. |

Additionally, the Downtown BID Association has agreed to use its Safety Ambassadors (SAMS) personnel to identify and assist persons in need of shelter this winter in its designated area. The Community Partnership and outreach providers will continue to work with the BID workers to train them and coordinate their efforts with the rest of the outreach services.

**HYPOTHERMIA ALERT:** The District's Emergency Management Agency (EMA) will continuously provide the Partnership with a three-day forecast of weather conditions so that emergency facilities can be prepared and opened as needed. EMA shall notify the Watch Commander, Communications Division, Metropolitan Police Department, the Mayor's Command Center and the Community Partnership prior to 1:00 p.m. on any day the Hypothermia Alert is scheduled to be put into effect. The Partnership then informs the UPO Shelter Hotline and all shelter providers to open hypothermia shelters from 7:00 p.m. to 7:00 a.m. and to keep these and all other emergency shelters open as warming spaces until such time as the temperature rises above the 32-degree level.

**COMMUNICATION:** The success of the Winter Plan depends upon several levels of daily communication during the hypothermia season: 1) between the providers of shelter beds and services; 2) between homeless people and the providers of shelter beds and services; and 3) between the public, providers and the homeless (to let the public know how to help, and the public helping to identify homeless people in need of assistance).

The centerpiece of communication will be the Hypothermia Hotline numbers staffed by the United Planning Organization. The telephone numbers are as follows:

## (202) 399-7093
## Hypothermia Hotline for Use by Service Providers

## 1-(800) 535-7252
## Emergency Assistance Number for Homeless Persons
## And the General Public

The Shelter Hotline and Emergency Assistance Numbers will be displayed widely. Newspapers will be asked to announce these numbers on a regular basis, encouraging the public to clip and post them for reference. Business associations will be asked to disseminate the numbers to their members. Flyers with the numbers will be distributed repeatedly throughout the District through outreach agencies, such as UPO, and the MPD and PPD and the Emergency Management Agency. The MPD and PPD will have these emergency numbers readily available in squad cars, at roll call and through dispatch, for officers and the inquiring public.

By using these methods, the District, UPO, participating agencies and the Partnership will encourage members of the public to be vigilant in calling the Hypothermia Hotline immediately when they know of or see an individual in need of assistance. The toll-free hotline number 1-800-535-7252 is reserved for use by homeless persons facing an emergency and for the general public's use in reporting emergency situations. To this end, UPO will again prepare pocket-sized English and Spanish cards to be handed out to homeless persons who are potentially in jeopardy during the hypothermia season.

**The Hypothermia Watch Partners Campaign** is managed by the D.C. Department of Human Services (DHS) Office of Communications and Public Affairs (OCPA). The campaign will be in effect for the third season and will include the following activities:

- Metro Advertisement: The Office of Communications and Public Affairs (OCPA) of the Department of Human Services will coordinate the development and distribution of Hypothermia Shelter Hotline advertisements on Metro buses and subway advertising space, should it be deemed an effective action for the coming season.

- PSAs: The DHS OCPA will also determine the use of/release of television and radio Public Service Announcements (PSAs) featuring the hypothermia prevention shelter hotline number. The announcements, if used, will educate the public about the dangers of hypothermia for homeless people living outdoors during the winter months, and will encourage District residents to call the Shelter Hotline to report the location of homeless people seen outside in hypothermic weather conditions. In addition, radio advertisement airtime has previously been commissioned for 60-second informational spots. These spots have aired every other week of the Hypothermia Season, between the hours of 10:00 a.m. and 12:00 midnight. Additional 15-second promotional announcements, will aire each week and be utilized to promote the Hypothermia Watch Partner Campaign. Comcast Cable's weather channel can be commissioned to run a message on the Hypothermia Watch and the Hotline number 12 times per day, seven days per week for 21 weeks.

- Newspaper: Quarter-page Hypothermia Shelter Hotline advertisements will be placed in community newspapers (*The Hill Rag, Northwest Current, and East of the River News*) and hypothermia alert signs will be developed for distribution to outreach providers serving the homeless.

- DHS OCPA will conduct a public information and awareness campaign for the Hypothermia Season through the dissemination of promotional materials in both English and Spanish. The materials will include interior and exterior metro bus and rail public service advertisements, flyers, posters, decals, buttons, and business cards displaying the Hypothermia Shelter Hotline number on them. The flyers and business cards will include not only the Hypothermia hotline number, but also will provide a list of participating shelters. The Hypothermia promotional materials will be provided to local government agencies, the Council of the District of Columbia, community-based organizations, business owners, churches and a host of other groups and organizations engaged in providing services in the District's neighborhoods.

**TRANSPORTATION:** UPO will operate a radio communication system on a 24-hour schedule (a base station with six radios on the street) to coordinate hypothermia services on the streets. Van drivers will have a radio with them at all times. The hand held radios will facilitate effective communication between UPO vans and other outreach workers who may call for help or transportation. If a person needs shelter, a van will be dispatched and an assessment made of

where the person should be sheltered for the night, depending on bed availability and on the person's needs. The Fire Department Emergency Medical Team will be notified whenever a person appears to be suffering from hypothermia.

UPO will provide six vans overnight and two in the morning. Three overnight vans will concentrate their outreach efforts in areas where large populations of homeless individuals congregate. These areas include the Ward 1 and 3 downtown area; Ward 5 near New York Avenue and Ward 7 near Minnesota Avenue; and Ward 4 near Union Station. The remaining three vans will traverse the city to pick up individuals from shelters that have exceeded capacity and to pick up individuals that have called the shelter hotline for assistance. The Department of Parks and Recreation will provide transportation to and from both DC General and 801 East from the downtown area in the morning and evenings. The Department of Parks and Recreation will pick up persons at 6:00pm at the First Congregational Church, 945 "G" Street, NW and transport them to 801 East and DC General (Harriett Tubman Center) until midnight, seven days a week. In the morning (6:00am), seven days a week, the Department of Parks and Recreation will pick up persons at the 801 East site and the DC General (Harriett Tubman Center) site and transport them to the First Congregational Church (Downtown Bids) location until 8:00am. The Coalition for the Homeless will provide a van when the demand for transportation exceeds what UPO and others can handle. If additional vehicles are needed because of extremely inclement weather such as snowy or icy conditions, a cadre of volunteers with four-wheel drive vehicles has been identified.   UPO will also communicate with the House of Ruth and the Salvation Army "grate patrol" vans so that these organizations can request help for persons they find on the street. Van routes will include all wards of the city with a concentration of areas known and identified by outreach workers and others as sites where the homeless congregate.

Transportation will include both moving people to shelters and from shelters, transporting individuals from over-crowded shelters to under-crowded shelters as needed and moving supplies to the street for those who do not accept shelter.

**PSYCHIATRIC IMPAIRMENT:** If psychiatric impairment is suspected, a request will be made to the Comprehensive Psychiatric Emergency Program (CPEP) of the Department of Mental Health (DMH) to conduct an on-site evaluation of the person and possibly take the person in for observation and evaluation, if deemed appropriate. The Community Partnership and DMH staff will provide outreach workers with orientation, training and written materials. These tools will help the outreach workers in understanding psychiatric impairments and how to make an initial determination as to whether to get CPEP involved with an on-site evaluation.

**HEALTH SERVICES:** Unity Health Care (UHC) is under contract with the District Government to operate year-around clinics at various shelter locations. It also operates a mobile-medical-outreach van for the non-sheltered homeless. Persons in need of non-emergency medical care or treatment and able to wait until the clinics open the next day will be referred to UHC for follow-up. Persons needing more serious or emergency health care will be referred to the Fire Department for pick-up and transport to a hospital. As deemed necessary, the Department of Health (DOH) will provide medical consultation to shelter providers. Additionally, DOH will disseminate hypothermia fact sheets throughout the community-at-large to prevent hypothermic deaths and illnesses among the homeless population.

**LATINO SERVICES:** UPO will produce both cards and flyers in Spanish for distribution to Latino organizations. The District's Office of Latino Affairs will assist in the distribution of these materials. Two bilingual (English-Spanish) outreach workers will work from Neighbors Consejo to conduct outreach in the Columbia Heights and Mt. Pleasant areas. The UPO Hotline will have bilingual staff at the Hotline office and will hire a bilingual driver to operate one of the vans that will be on the street this winter. The Shrine of the Sacred Heart is expected to be heavily used by Latino homeless persons.

**SUPPLIES:** The Community Partnership works closely with volunteers and nonprofit agencies to secure supplies for distribution and use during the hypothermia season. The District and its partners will distribute the blankets now in storage. An ample inventory of other supplies will be on hand: cots, sleeping bags, jackets, boots, hats, gloves and scarves. As is the custom, twenty thousand (20,000) blankets have been ordered from the US Department of Defense and an additional five thousand (5,000) blankets have been ordered from a private source. The Community Partnership and UPO hypothermia staff will coordinate the retrieval and storage of all supplies. UPO handles donated goods from the public at its Carver Terrace site. Residents from the apartment complex volunteer to help handle and sort donations.

**POLICE/OUTREACH COOPERATION:** The Metropolitan Police Department (MPD) is committed to assisting homeless outreach agencies and workers that wish to enter a building to speak with a person who is homeless. Assistance from MPD can be obtained by calling the 311-phone line, which will cause an officer to be dispatched for assistance. MPD has been involved in ongoing training, conducted by the Department of Mental Health (DMH), around the application of the FD12 involuntary commitment procedure.

**TRAINING:** Hypothermia training for outreach and shelter providers will be conducted by The Community Partnership and is currently scheduled to begin in the third week of October 2004 and no later than November 1. All agency directors and/or designated staff directly involved in the provision and management of hypothermia related services will be asked to attend an initial review of protocols, processes, communications and responsibilities related to Hypothermia season.

## PROTECTING CONSUMERS' RIGHTS

**Legislative Mandate:** The Winter Plan implements the provisions of D. C. Law 7-24, the "Frigid Temperature Protection Amendment Act of 1988." The law was enacted to assure that persons who are homeless are protected from injury and death from hypothermia by providing shelter for them when the temperature falls below 26 degrees Fahrenheit. The District of Columbia provides hypothermia assistance whenever the air temperature falls below 32 degrees or the wind chill factor creates the effect of 32 degrees or below conditions. Under such conditions, the District government is mandated to use public buildings to make whatever space is necessary to get everyone inside that agrees to come inside.

As has been done in all past hypothermia seasons, efforts will continue in serving to protect the consumers' right to shelter during the hypothermia season.

**Mayor Anthony Williams' Executive Order** to improve Hypothermia season procedures and protocols will be in force for its fourth winter season.  The Order memorializes and lends the force of mayoral authority to procedures of coordination and communication that were developed by city officials and front-line outreach workers. The Order establishes procedures between the Metropolitan Police Department (MPD), the Department of Health's Addiction, Prevention and Recovery Administration (APRA), The Community Partnership, and the Department of Mental Health (DMH) regarding their respective roles in removing persons from the street under hypothermic conditions who present a danger to themselves or others.  These procedures will entail expanding the use of the "FD-12" involuntary commitment order for mentally ill persons and making use of the under-used statute that allows severely intoxicated persons to be taken from the streets and placed in shelter, detox or hospital, as indicated. DMH is providing training to MPD and outreach workers on the FD-12 process.  APRA will receive any persons removed from the street in need of detox services.  (See Mayor's Order for details.)

## OTHER EFFORTS IN THE WINTER OF 2005-2006

- The Community Partnership will convene outreach agencies and emergency shelter providers for training of their key staff to prepare for the Hypothermia season.  In addition to the annual dissemination of information about Hypothermia and improving coordination of services, the training will focus on the rights and protections that persons who are homeless have in accessing shelter and services.

- DHS and The Community Partnership will re-issue a written directive to all emergency shelter administrators and front line staff concerning the policy for serving persons who are homeless who come to shelter under the influence of alcohol or drugs. The providers will be required to train staff on this directive.  The policy remains the same as it has been in the past – that persons impaired by substance abuse must be allowed into shelter and may stay so long as their behavior does not become disruptive or a danger to others.  In the case of disruptive or belligerent behavior, the shelter staff must call the police to have the person removed from the shelter.  In no case shall any shelter staff eject an inebriated resident from a shelter without the police present.  While this policy is in effect year-round, it is particularly critical that it be reinforced and practiced during the Hypothermia Season.

❀❀❀❀❀

Attachment A

# THE WINTER PLAN
## Winter 2005-2006 Facility Listing

## 12 – Hour Emergency Shelters

### MEN

LaCasa Shelter
1436 Irving Street, N.W.
Washington, D.C.
(202) 673-3592

Franklin School
13th and K Streets, N.W.
Washington, D.C.
(202) 638-7424

New York Avenue Shelter
1355-57 New York Ave.
Washington, D.C.
(202) 832-2359

801 East Shelter
801 Making Life Better Lane S.E.
Washington, D.C.
(202) 561-4014

### WOMEN

Madison Shelter
651 10th Street, N.E.
Washington, D.C.
(202) 547-2600

Open Door
425 2nd Street, N.W.  (At corner of
2nd St. & E St.)
Washington, D.C.
(202) 639-8093

Hermano Pedro Center
1501 Park Road NW
Washington, D.C. 20010
(202) 332-2874

D.C. General Hospital- Cafeteria
1900 Massachusetts Ave., S.E.
Washington, D.C.
(202) 639-9760

## 24 – Hour Shelter

### MEN

LaCasa Shelter
1436 Irving Street, N.W.
Washington, D.C.
(202) 673-3592

Emery House (working men)
1725 Lincoln Road, N.E.
Washington, D.C.
(202) 635-1041

### WOMEN

Madison Shelter
651 10th Street, N.E.
Washington, D.C.
(202) 547-2600

Calvary Women's Shelter
928 5th Street, N.W.
Washington, D.C
(202) 783-6651

Homeless Assistance Center @
New York Avenue Shelter
1355-57 New York Ave.
Washington, D.C.
(202) 832-2359

TRP @ 801 East Shelter
801 Making Life Better Lane S.E.
Washington, D.C.
(202) 561-4014

John Young Center
115 D Street, N.W.
Washington, D.C.
(202) 635-8469

New Endeavors by Women
611 N Street, N.W
Washington, D.C.
(202) 682-5825

Hannah House
928 5th Street, N.W.
Washington, D.C.
(202) 289-4840

## **Family Shelters**

D.C. Village Overflow  (18 units year-round)
#4 DC Village Lane, S.W.
Washington, D. C.
(202) 561-8090

## **Hypothermia /Overflow Shelters**

### **MEN**

Federal City Shelter (CCNV)
425 Second Street, N.W
Washington, D.C.
(202) 737-5098

First Seventh Day Adventist
Church
801 Shepard St., N.W.
Washington, D.C.
(202) 829-0997

### **WOMEN**

John Young Center
115 D Street, N.W.
Washington, D.C.
(202) 635-8469

Banneker Recreation Center
7th & O Street N.W.
Washington, D.C.
(202) 673-6861

2005-2006 Winter Plan

Sacred Heart Church
16th & Park Road, N.W.
Washington, D.C.
(202) 234-8000

St Vincent DePaul
14 M Street, S.E.
Washington, D.C. 20003
(202) 488-1354

St. Aloysius Church
# 19 I Street, N.W.
Washington, D.C.
(202) 336-7200

DCGH Sobering Center
1900 Massachusetts Avenue, SE
Building 12
Washington, D.C. 20003
(202) 698-6082

St. Luke's Church
3655 Calvert Street N.W.,
Washington, D.C. 20007
202-333-4949

## **Family Shelters**

D.C. Village Overflow- Cottage 2B
#4 DC Village Lane, S.W.
Washington, D.C.
(202) 561-8090

D.C. General Hospital/Unit 42
1900 Massachusetts Ave., S.E.
Washington, D.C.
(202) 639-9760

Attachment B

## Vacancy/Overflow Charts for Fy04 and Fy05:
## Men, Women and Families

The pages that follow present graphically the relationship between supply and demand of beds for adult men and women and for families during the past two hypothermia seasons. Reading from the bottom of the charts to the top, the bars represent vacant beds or units on the days between November 1 and March 31. The X-axis is normalized to represent the daily capacity that was subject to change each day during the hypothermia alerts as new shelters opened and/or new facilities were brought on line. If the bars are to the right of the zero on the X-axis, then they represent the number of vacant beds; and if the bars are to the left of the X-axis and the zero, then they are depicting the number of adults or families sheltered in an overflow situation. This data comes from the daily census maintained by the United Planning Organization and the Community Partnership for the Prevention of Homelessness.

These graphs show clearly that the capacity for men in both years was adequate to shelter all who needed it, although in FY'04 there were some days when all but a few beds for men were filled. For that reason the capacity for men was increased and in the FY'05 winter season the shelter capacity for men was well more than adequate. For women and families in FY'04 there were a number of days when these persons had to be sheltered in an overflow situation beyond the planned capacity of the facilities. By FY'05 the city had increased the capacity for women and there were no days during the season when women's facilities filled to overflowing. Similarly, the city increased the hypothermia shelter capacity for families in FY'05 and reduced sharply the number of days when the family shelter facilities were overflowing.

As compared to FY'05, the city will have more beds and units available at the start of the FY'06 season in all categories: men, women and families. As always an adjustment will be made if capacity is exceeded, but it appears that the capacity detailed in this Winter Plan will ensure that everyone has a place to come inside during hypothermia alerts.



2005-2006 Winter Plan

17





**Fy04 Hypothermia Season Daily Shelter Vacancies/Overflow: Families**

**Units (> 0 = Vacancy; < 0 = Overflow)**

2005-2006 Winter Plan

19



2005-2006 Winter Plan

20



Fy05 Hypothermia Season Daily Shelter Vacancies: WOMEN

Beds

2005-2006 Winter Plan

21



Fy05 Hypothermia Season Daily Shelter Vacancies or Overflow: FAMILIES

Units (> 0 = Vacancy; < 0 = Overflow)

2005-2006 Winter Plan

22

ENROLLED ORIGINAL

AN ACT

*Codification
District of
Columbia
Official Code*

*2001 Edition*

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

*2005 Fall
Supp.*

———————————

*West Group
Publisher*

To reaffirm the District of Columbia's commitment to addressing the problem of homelessness, to establish the Interagency Council on Homelessness and describe its members, powers, and duties, to describe the Continuum of Care for individuals and families who are homeless or at imminent risk of becoming homeless, to codify the rights and responsibilities of clients of homeless services providers, and the standards by which the District of Columbia and homeless services providers must deliver services to clients, and to revise the procedures for resolving disputes between clients and providers of homeless services.

TABLE OF CONTENTS

Sec. 2. Definitions.
Sec. 3. Application.
Sec. 4. Establishment of Interagency Council on Homelessness.
Sec. 5. Powers and duties of the Interagency Council.
Sec. 6      Operation of the Interagency Council.
Sec. 7. Continuum of Care for individuals and families who are homeless.
Sec. 8. Eligibility for services within the Continuum of Care.
Sec. 9. Client rights.
Sec. 10.     Additional rights for clients in temporary shelter or supportive housing.
Sec. 11.     Client responsibilities.
Sec. 12.     Common standards for providers.
Sec. 13.     Additional standards for providers of severe weather shelter.
Sec. 14.     Additional standards for providers of low barrier shelter.
Sec. 15.     Additional standards for providers of temporary shelter and supportive housing.
Sec. 16.     Additional standards for providers of transitional housing.
Sec. 17.     Monitoring and inspections.
Sec. 18.     Program Rules.
Sec. 19.     Notice.
Sec. 20.     Transfer.
Sec. 21.     Suspension.

| Sec. 22. | Termination. |
| Sec. 23. | Alternative sanctions.Sec. 24. Emergency transfers, suspensions, or terminations. |
| Sec. 25. | Mediation. |
| Sec. 26. | Fair hearings. |
| Sec. 27. | Administrative review. |
| Sec. 28. | No entitlement to services. |
| Sec. 29. | Limitation on use of District monies. |
| Sec. 30. | Contracting authority. |
| Sec. 31. | Rulemaking authority. |
| Sec. 32. | Conforming amendments. |
| Sec. 33. | Fiscal impact statement. |
| Sec. 34. | Effective date. |

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Homeless Services Reform Act of 2005".

Sec. 2. Definitions.

For the purposes of this act, the term:

(1) "Administrative Procedure Act" or "APA" means the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat 1204; D.C. Official Code § 2-501 *et seq.*).

(2) "Adult" means any individual who:

(A) Has reached the age of majority under District law as defined in section 2 of the District of Columbia Age of Majority Act, effective July 22, 1976 (D.C. Law 1-75; D.C. Official Code § 46-101); or

(B) Qualifies as an emancipated minor under District law.

(3) "Apartment style" means a housing unit with:

(A) Separate cooking facilities and other basic necessities to enable families to prepare and consume meals;

(B) Separate bathroom facilities for the use of the family; and

(C) Separate sleeping quarters for adults and minor children in accordance with the occupancy standards of Title 14 of the District of Columbia Municipal Regulations (Housing).

(4) "Appropriate permanent housing" means permanent housing that does not jeopardize the health, safety, or welfare of its occupants, meets the District's building code requirements, and is affordable for the client.

(5) "Appropriately trained and qualified" means having received specialized training designed to teach the skills necessary to successfully perform one's job and to work compassionately with individuals and families who are homeless or at imminent risk of becoming homeless.

(6) "Basic necessities" means a dinette set, refrigerator, stove, exhaust fan or

ENROLLED ORIGINAL

window, storage cabinets, cookware, flatware, and tableware.

(7) "Client" means an individual or family seeking, receiving, or eligible for services from a program covered by section 3.

(8) "Continuum of Care" means the comprehensive system of services for individuals and families who are homeless or at imminent risk of becoming homeless and designed to serve clients based on their individual level of need. The Continuum of Care may include crisis intervention, outreach and assessment services, shelter, transitional housing, permanent supportive housing, and supportive services.

(9) "Crisis intervention" means assistance to prevent individuals and families from becoming homeless, which may include, but need not be limited to, cash assistance for security deposits, rent or mortgage payments, credit counseling, mediation with landlords, and supportive services.

(10) "Culturally competent" means the ability of a provider to deliver or ensure access to services in a manner that effectively responds to the languages, values, and practices present in the various cultures of its clients so the provider can respond to the individual needs of each client.

(11) "Day program" means a facility that provides open access to structured activities during set hours of the day to meet the supportive services needs of individuals and families who are homeless or at imminent risk of becoming homeless.

(12) "Department" means the Department of Human Services.

(13) "District" means the District of Columbia government, its agents, or its designees.

(14) "Drop-in center" means a facility that delivers supportive services that may include food, clothing, showers, medical services, and employment services.

(15) "Drug" means a controlled substance as defined in section 102(4) of the District of Columbia Uniform Controlled Substances Act of 1981, effective August 5, 1981 (D.C. Law 4-29; D.C. Official Code § 48-901.02(4)), or the Controlled Substances Act of 1970, approved October 27, 1970 (84 Stat. 1242; 21 U.S.C. § 801 *et seq.*).

(16) "Family" means:

(A) A group of individuals with at least one minor or dependent child, regardless of blood relationship, age, or marriage, whose history and statements reasonably tend to demonstrate that they intend to remain together as a family unit; or

(B) A pregnant woman in her third trimester.

(17) "Group home" means a housing unit with:

(A) Sleeping quarters that may be shared;

(B) Shared cooking and bathroom facilities; and

(C) Other basic necessities to enable individuals or families to prepare and consume meals.

(18) "Homeless" means:

(A) Lacking a fixed, regular residence that does not jeopardize the health, safety, or welfare of its occupants, and lacking the financial ability to immediately acquire one; or

ENROLLED ORIGINAL

       (B)  Having a primary nighttime residence that is:

          (i)  A supervised publicly or privately operated shelter or transitional housing facility designed to provide temporary living accommodations; or

          (ii)  A public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

       (19)  "Housing First" means a program that provides clients with immediate access to independent permanent housing and supportive services without prerequisites for sobriety or participation in psychiatric treatment. Clients in Housing First programs may choose the frequency and type of supportive services they receive and refusal of services will have no consequence for their access to housing or on continuation of their housing and supportive services.

       (20)  "Hyperthermia shelter" means a public or private building that the District shall make available, for the purpose of providing shelter to individuals or families who are homeless and cannot access other shelter, whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit. The term "hyperthermia shelter" does not include overnight shelter.

       (21)  "Hypothermia shelter" means a public or private building that the District shall make available, for the purpose of providing shelter to individuals or families who are homeless and cannot access other shelter, whenever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit.

       (22)  "Individual with a disability" means a person with a physical or mental impairment that substantially limits the major life activities of the person.

       (23)  "Imminent risk of becoming homeless" means the likelihood that an individual's or family's circumstances will cause the individual or family to become homeless in the absence of prompt government intervention.

       (24)  "Imminent threat to the health or safety" means an act or credible threat of violence on the grounds of a shelter or supportive housing facility.

       (25)  "Interagency Council" means the Interagency Council on Homelessness established pursuant to section 4.

       (26)  "Low barrier shelter" means an overnight housing accommodation for individuals who are homeless, provided directly by, or through contract with or grant from, the District, for the purpose of providing shelter to individuals without imposition of identification, time limits, or other program requirements;

       (27)  "Member agency" or "member agencies" means the District agencies or divisions thereof represented on the Interagency Council pursuant to section 4(b).

       (28)  "Permanent supportive housing" means supportive housing for an unrestricted period of time for individuals and families who were once homeless and continue to be at imminent risk of becoming homeless, including persons with disabilities as defined in 24 C.F.R. § 582.5, for whom self-sufficient living may be unlikely and whose care can be supported through public funds.

       (29)  "Program Rules" means the set of provider rules, client rights, and complaint and appeal procedures, including those enumerated in this act, proposed by a

**ENROLLED ORIGINAL**

particular provider for the purpose of governing the behavior and treatment of its clients and approved by the Mayor subject to section 18.

(30) "Provider" means an individual or entity within the Continuum of Care that operates a program covered by section 3.

(31) "Public assistance" means government-funded payments in or by money, medical care, remedial care, shelter, goods or services to, or for the benefit of, needy persons.

(32) "Resident of the District" means an individual or family who is living in the District voluntarily and not for a temporary purpose and who has no intention of presently moving from the District. The term "resident of the District" shall be interpreted and applied in accordance with section 503 of the District of Columbia Public Assistance Act of 1982, effective April 6, 1982 (D.C. Law 4-101; D.C. Official Code § 4-205.03).

(33) "Sanction" means an adverse action taken by a provider affecting the delivery of services to a client, and may include loss of privileges or denial, reduction, delay, transfer for inappropriate or punitive reasons, suspension, or termination of services.

(34) "Service plan" means a written plan collaboratively developed and agreed upon by both the provider and the client, consisting of time-specific goals and objectives designed to promote self-sufficiency and attainment of permanent housing and based on the client's individually assessed needs, desires, strengths, resources, and limitations.

(35) "Severe weather conditions" means the outdoor conditions whenever the actual or forecasted temperature, including the wind chill factor or heat index, falls below 32 degrees Fahrenheit or rises above 95 degrees Fahrenheit.

(36) "Severe weather shelter" means hyperthermia shelter or hypothermia shelter.

(37) "Shelter" means severe weather shelter, low barrier shelter, and temporary shelter.

(38) "Supportive housing" means transitional housing and permanent supportive housing.

(39) "Supportive services" means services addressing employment, physical health, mental health, alcohol and other substance abuse recovery, child care, transportation, case management, and other health and social service needs which, if unmet, may be barriers to obtaining or maintaining permanent housing.

(40) "Temporary shelter" means:

(A) A housing accommodation for individuals who are homeless that is open either 24 hours or at least 12 hours each day, other than a severe weather shelter or low barrier shelter, provided directly by, or through contract with or grant from, the District, for the purpose of providing shelter and supportive services; or

(B) A 24-hour apartment-style housing accommodation for individuals or families who are homeless, other than a severe weather shelter, provided directly by, or through contract with or grant from, the District, for the purpose of providing shelter and supportive services.

(41) "Transitional housing" means a 24-hour housing accommodation, provided directly by, or through contract with or grant from, the District, for individuals and families

**ENROLLED ORIGINAL**

who:

   (A) Are homeless;

   (B) Require a structured program of supportive services for up to 2 years or as long as necessary in order to prepare for self-sufficient living in permanent housing; and

   (C) Consent to a case management plan developed collaboratively with the provider.

   (42) "Weapon" means any pistol or other firearm (or imitation thereof), or other dangerous or deadly weapon, including a sawed-off shot gun, shot gun, machine gun, rifle, dirk, bowie knife, butcher knife, switch blade knife, razor, black jack, billy club or metallic or other false knuckles, as referenced in section 2 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 560; D.C. Official Code § 22-4502), and any air gun, air rifle, canon, torpedo, bean shooter, sling, projectile, dart, BB gun, spring gun, blow gun, other dangerous missile or explosive, or other dangerous weapon or ammunition of any character, as referenced in Chapter 23 of Title 24 of the District of Columbia Municipal Regulations.

  Sec. 3.  Application.

  (a)  The provisions in sections 9-27 shall apply to:

   (1) Each program within the Continuum of Care offered by the District of Columbia or by a provider receiving funding for the program from either the District of Columbia or the federal government, if such funds are administered, whether by grant, contract, or other means, by the Department of Human Services or its designee; and

   (2) Clients of programs covered under paragraph (1) of this subsection.

  (b)  In multi-program agencies, the provisions in sections 9-27 shall only apply to those programs that meet the criteria in subsection (a) of this section and clients of those programs.

  (c)  This section shall not be construed to expand or limit the requirements of any other provision of this act.

  Sec. 4. Establishment of Interagency Council on Homelessness.

  (a)  There is established in the District the Interagency Council on Homelessness for the purpose of facilitating interagency, cabinet-level leadership in planning, policymaking, program development, provider monitoring, and budgeting for the Continuum of Care of homeless services.

  (b)  The Interagency Council is composed of:

   (1) The City Administrator, who shall serve as chairperson of the Interagency Council;

   (2) The administrative head of each of the following entities or divisions thereof:

    (A)  Department of Human Services;

    (B)  Department of Mental Health;

    (C)  Child and Family Services Agency;

    (D)  Department of Housing and Community Development;

**ENROLLED ORIGINAL**

    (E)  Department of Health;
    (F)  District of Columbia Housing Authority;
    (G)  Department of Corrections;
    (H)  Department of Employment Services;
    (I)  District of Columbia Public Schools;
    (J)  District of Columbia Emergency Management Agency;
    (K)  Office of Property Management; and
    (L)  Metropolitan Police Department;

    (3)  A representative of any private entity designated to approve or allocate any grants or contracts, on behalf of the Mayor, for services within the Continuum of Care;

    (4)  A representative from a minimum of 4 and a maximum of 10 organizations that are providing services within the Continuum of Care;

    (5)  A minimum of 2 and a maximum of 5 homeless or formerly homeless individuals;

    (6)  A minimum of 2 and a maximum of 5 advocates for the District of Columbia's homeless population; and

    (7)  The Chairman of the Council, or his or her designee, and the Chairman of the committee of the Council having purview over homeless services, or his or her designee, both of whom shall be non-voting members.

    (c)  All non-government members of the Interagency Council described in subsections (b)(4)-(6) of this section shall be nominated for appointment by the Mayor and approved by the Council.  The Mayor shall transmit to the Council, within 90 days of the effective date of this act, nominations of each non-government member of the Interagency Council for a 60-day period of review, excluding days of Council recess.  If the Council does not approve or disapprove a nomination by resolution within the 60-day review period, the nomination shall be deemed approved.

    Sec. 5.  Powers and duties of the Interagency Council.

    (a)  The Interagency Council shall provide leadership in the development of strategies and policies that guide the implementation of the District's policies and programs for meeting the needs of individuals and families who are homeless or at imminent risk of becoming homeless.

    (b)  In fulfilling the responsibility described in subsection (a) of this section, the Interagency Council shall:

    (1)  Coordinate an annual, community-wide needs-assessment and planning process to identify, prioritize, and target needs for services within the Continuum of Care.  The needs-assessment shall take into account existing data and include input from at least one public hearing, which shall be held at least once each year;

    (2)  At least every 5 years, prepare and publish a strategic plan for services within the Continuum of Care that takes into account existing data and community input;

    (3)  Prepare an annual plan detailing how the District intends to provide or arrange for services within the Continuum of Care that takes into account existing data and

**ENROLLED ORIGINAL**

community input;

      (4)  Review on a regular basis the efforts of each member of the Interagency Council to fulfill the goals and policies of the annual plan prepared pursuant to paragraph (3) of this subsection, including a review of the number and nature of contracts and grants entered into by each agency to provide services within the Continuum of Care;

      (5)  Prepare and submit to the Mayor an annual written report evaluating the efforts of each member agency of the Interagency Council to meet the goals and policies of the annual plan prepared pursuant to paragraph (3) of this subsection;

      (6)  Direct the Office of Property Management to identify vacant public buildings or tax-foreclosed buildings to be used as shelter and supportive housing facilities;

      (7)  Provide input into the District's planning and application for federal funds for services within the Continuum of Care. All applications for federal funds shall take into account the strategic plan developed by the Interagency Council prepared pursuant to paragraph (2) of this subsection;

      (8)  Have access to data collected and generated by a computerized information system as set up by the Mayor pursuant to section 8(d). The data may include the number of beds or units available in the District's shelter and supportive housing facilities, the availability of supportive services in the District, and the current usage of and unmet demand for such beds, units, and services;

      (9)  By September 1 of each year, develop a plan, consistent with the right of clients to shelter in severe weather conditions, describing how member agencies will coordinate to provide hypothermia shelter and identifying the specific sites that will be used as hypothermia shelters; and

      (10)  Review reports of the fair hearings and administrative reviews requested or received by clients within the Continuum of Care, which shall include the provider party to the appeal, the subject matter of the appeal, and the final disposition of the appeal.

    (c)  The Mayor shall, no later than February 1 of each year, make available to all Interagency Council members the District's proposed budget breakdown of each agency's appropriations for services within the Continuum of Care. The Interagency Council shall give comments to the Mayor regarding the proposed budget.

    (d)  Each member agency of the Interagency Council shall:

      (1)  Conduct or commission an annual audit of any private entity designated by the agency to approve or allocate any grants or contracts, on behalf of the Mayor, for services within the Continuum of Care, and make available a report of the audit to all Interagency Council members;

      (2)  Offer training and technical assistance to its employees who directly provide services within the Continuum of Care and to any providers with which the member agency or its designee contracts to deliver the services; and

      (3)  Report to the Interagency Council on a quarterly basis currently available data on the number of individuals and families that applied for homeless services and the number of homeless individual or families that were served by the agency and its contractors.

Sec. 6. Operation of the Interagency Council.

(a) The Interagency Council shall meet not less than quarterly. All meetings of the Interagency Council shall comply with the following requirements:

(1) A quorum of one-third of the appointed representatives of member agencies, one-third of appointed representatives of providers of homeless services, and one-third of the appointed homeless or formerly homeless individuals or advocates must be present in order to conduct the business of the Interagency Council;

(2) The meetings of the Interagency Council, and the meetings of any committees it shall establish pursuant to subsection (c) of this section, shall be subject to the open meeting provisions of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 831; D.C. Official Code § 1-207.42); and

(3) The Interagency Council shall provide a reasonable opportunity at the beginning of each meeting during which members of the public may comment on matters relevant to the work of the Interagency Council.

(b) The Interagency Council shall enact rules of procedure or bylaws to guide the regular operation of the Interagency Council. The rules of procedure or bylaws shall be made available to the public upon request.

(c) The Interagency Council may establish committees to aid in conducting its business. No meeting of a committee of the Interagency Council shall qualify as a meeting of the Interagency Council for purposes of fulfilling the requirements in subsection (a) of this section.

(d) The Mayor shall, within 30 days of the effective date of this act, designate an existing department or agency to provide staff assistance and support to the Interagency Council.

Sec. 7. Continuum of Care for individuals and families who are homeless.

(a) The District's provision of homeless services shall be based on a Continuum of Care that offers a comprehensive range of services through various member agencies and is designed to meet the specific, assessed needs of individuals and families who are homeless or at imminent risk of becoming homeless. The District shall respond to the changing needs of individuals and families by ensuring that transfer between and among services within the Continuum of Care is fluid and allows clients to modify the intensity of services they receive to meet their needs, preferences, and changing circumstances.

(b) The Continuum of Care may include the following range of services:

(1) Crisis intervention for the purpose of preventing homelessness by enabling individuals and families at imminent risk of becoming homeless to remain in or access permanent housing; provided, that the Mayor shall not offer crisis intervention services authorized by this paragraph until the Chief Financial Officer has certified the availability of fiscal year 2006 funding pursuant to section 1016(5) of the Fiscal Year 2006 Budget Support Act of 2005, passed on 2nd reading on July 6, 2005 (Enrolled version of Bill 16-200);

(2) Outreach and assessment, including the operation of a hotline, for the purpose of identifying the housing and supportive service needs of individuals and families who

**ENROLLED ORIGINAL**

are homeless or at imminent risk of becoming homeless and linking them to appropriate services;

(3) Shelter to meet the housing needs of individuals and families who are homeless through the provision of:

(A) Severe weather shelter for the purpose of protecting lives in extreme hot and cold weather;

(B) Low barrier shelter for individuals for the purpose of sheltering and engaging individuals who avoid temporary shelter because of identification, time limit, or other program requirements; and

(C) Temporary shelter for individuals and families for the purpose of meeting short-term housing needs and other supportive service needs;

(4) Supportive housing to meet the longer-term housing needs of individuals and families who are homeless through the provision of:

(A) Transitional housing for the purpose of providing eligible individuals and families who are homeless with long-term housing and supportive services in order to prepare them for self-sufficient living in permanent housing; and

(B) Permanent supportive housing for the purpose of providing eligible individuals and families who are homeless or at imminent risk of becoming homeless with housing and supportive services;

(C) Housing First for the purpose of providing eligible individuals and families who are homeless with housing and supportive services;

(5) Supportive services for the purpose of providing individuals and families who are homeless or at imminent risk of becoming homeless with services that address their housing, employment, physical health, mental health, alcohol and other substance abuse recovery, child care, case management, transportation, and other health and social service needs which, if unmet, may be barriers to obtaining or maintaining permanent housing. These services may, but need not, be delivered through day programs, drop-in centers, shelters, and transitional and permanent supportive housing providers, or through referrals to other appropriate service providers.

(c) Whenever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit, the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any person in the District who is homeless and cannot access other shelter. In doing so, the District shall not use District of Columbia Public School buildings currently being used for educational purposes without the prior approval of the Board of Education.

(d) The Mayor shall not place homeless families in non-apartment style shelters.

Sec. 8. Eligibility for services within the Continuum of Care.

(a) An individual or family is eligible to receive services within the Continuum of Care if the individual or family:

(1) Is homeless or at imminent risk of becoming homeless;

**ENROLLED ORIGINAL**

(2) Is a resident of the District, as defined by section 503 of the District of Columbia Public Assistance Act of 1982, effective April 6, 1982 (D.C. Law 4-101; D.C. Official Code § 4-205.03); and

(3) Meets any additional eligibility requirements that have been established pursuant to section 17 by the provider from whom services are sought.

(b) No individual or family may be deemed ineligible for services solely because the individual or family cannot establish proof of homelessness or residency at the time of the individual or family's application for assistance.

(c)(1) The Mayor shall operate at least one central intake center for families for the purposes of:

(A) Assessing the eligibility of families for services within the Continuum of Care and making appropriate referrals for those services; and

(B) Serving as a resource center for families who are seeking information about the availability of services within the Continuum of Care.

(2) Families who are eligible for services within the Continuum of Care shall receive appropriate referrals to the first available provider based on the chronological order in which they apply for assistance, consistent with any additional eligibility requirements established pursuant to section 18 by the provider from whom services are sought.

(3) Any family who is determined to be eligible for services pursuant to subsection (c)(1)(A) of this section, but who is not immediately served due to lack of capacity, shall be placed on one or more waiting lists for the services sought and shall be served in the order in which appropriate referrals become available.

(4) Notwithstanding paragraph (2) of this subsection, in determining what is an "appropriate referral," the Mayor shall consider relevant factors, including prior receipt of services, disability, family size, affordability of housing and age, and may use these factors to prioritize a family's placement in shelter or other service.

(5) The Mayor shall not impose or apply eligibility criteria that exclude or tend to exclude an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any services within the Continuum of Care, unless such criteria are shown to be necessary for the provision of the services.

(d) The Mayor shall operate a computerized information system to collect, maintain, and distribute up-to-date information regarding the number of beds or units available in shelter and supportive housing in the District, the availability of supportive services, and the current usage and unmet demand for such beds, units, and services.

Sec. 9. Client rights.

Clients served within the Continuum of Care shall have the right to:

(1) At all times, be treated by providers and the Department with dignity and respect;

(2) Access services within the Continuum of Care free from discrimination on the basis of race, color, religion, national origin, language, culture, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation,

political affiliation, disability, and source of income, and in accordance with the Human Rights Act of 1977, effective December 13, 1977 (D.C. Law 2-38; D.C. Official Code § 2-1401.01 *et seq.*), the Americans with Disabilities Act of 1990, approved July 26, 1990 (104 Stat. 328; 42 U.S.C. § 12101 *et seq.*), the Rehabilitation Act of 1973, approved August 7, 1998 (112 Stat. 1095; 29 U.S.C. § 701 *et seq.*), Title II of the Civil Rights Act of 1964, approved July 2, 1964 (78 Stat. 243; 42 U.S.C. § 2000a *et seq.*), and the Language Access Act of 2004, effective June 19, 2004 (D.C. Law 15-167; D.C. Official Code § 2-1931 *et seq.*);

(3) Receive reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the client's provider demonstrates that the modifications would fundamentally alter the nature of the services;

(4) Access services within the Continuum of Care free from verbal, emotional, sexual, financial, and physical abuse and exploitation;

(5) Shelter in severe weather conditions;

(6) At a reasonable time and with reasonable prior notice, view and copy, or have an authorized representative view and copy, all records and information that are related to the client and maintained by the client's provider, including any relevant personal, social, legal, financial, educational, and medical records and information, subject to the provisions of paragraph (7) of this subsection;

(7) Confidential treatment by the Department and providers of personal, social, legal, financial, educational, and medical records and information related to a client or any member of a client's family, whether obtained from the client or from any other source, in a manner consistent with the confidentiality requirements of District and federal law;

(8) Engage in or abstain from the practice of religion, including the religion of a particular provider or other clients;

(9) Upon request, be told the name and job title of any provider staff member delivering services;

(10) Provide input and feedback to providers on their delivery of services;

(11) File complaints with a provider or the Mayor regarding the provider's delivery of services or treatment of the client;

(12) Participate actively in development of any service plan for the client, be told of the progress made toward the goals of that service plan, and receive a review of the service plan upon request;

(13) Be free from testing for drugs or alcohol except when:

(A) Program guidelines prohibit intoxication and a licensed social worker with experience identifying indications of drug or alcohol use or a certified addiction counselor determines that there is reasonable cause to believe that the client is engaging in drug or alcohol use; or

(B) A client consents to drug or alcohol testing as part of the client's case management plan developed in accordance with paragraph (12) of this subsection;

(14) Meet and communicate privately with attorneys, advocates, clergy, physicians, and other professionals;

**ENROLLED ORIGINAL**

(15) Timely notice, where required by section 19, of any decision by the Department or a provider that adversely affects the client's receipt of services within the Continuum of Care;

(16) Appeal, where permitted by sections 26 and 27, of any decision by the Department or a provider that adversely affects the client's receipt of services within the Continuum of Care;

(17) Be free from retaliation, punishment, or sanction for exercising any rights provided under this act; and

(18) Continuation of shelter and supportive housing services without change, other than transfer pursuant to section 20 or emergency transfer, suspension, or termination pursuant to section 24, pending the outcome of any fair hearing requested within 15 calendar days of receipt of written notice of a suspension or termination.

Sec. 10. Additional rights for clients in temporary shelter or supportive housing.

Clients residing in temporary shelter or supportive housing shall have the right to:

(1) Receive visitors in designated areas of the shelter or housing premises during reasonable hours and under such reasonable conditions as specified in the provider's Program Rules established pursuant to section 18;

(2) Leave and return to the shelter or housing premises within reasonable hours as specified by the Program Rules established pursuant to section 18;

(3) Reasonable prior notice specifying the date and time of any inspections of a client's living quarters and of the provider staff member authorized to perform the inspection, except when, in the opinion of the provider's executive or program director, there is reasonable cause to believe that the client is in possession of a substance or object that poses an imminent threat to the health and safety of the client or any other person on the provider's premises and such reasonable cause is documented in the client's record;

(4) Be present or have an adult member of the family present at the time of any inspection unless, in the opinion of the provider's executive or program director, there is reasonable cause to believe that the client is in possession of a substance or object that poses an imminent threat to the health and safety of the client or any other person on the provider's premises and such reasonable cause is documented in the client's record;

(5) Reasonable privacy in caring for personal needs and in maintaining personal living quarters; and

(6) Conduct their own financial affairs, subject to the reasonable requirements of Program Rules established pursuant to section 18 or to a service plan pursuant to section 9(12).

Sec. 11. Client responsibilities.

(a) Clients receiving services within the Continuum of Care shall:

(1) Seek appropriate permanent housing or Housing First, except when the client is residing in severe weather and low barrier shelter;

(2) Seek employment, education, or training when appropriate, except when the

client is residing in severe weather and low barrier shelter;

      (3) Refrain from the following behaviors while on a provider's premises:

          (A) The use or possession of alcohol or illegal drugs;

          (B) The use or possession of weapons;

          (C) Assaulting or battering any individual, or threatening to do so; and

          (D) Any other acts that endanger the health or safety of the client or any other individual on the premises;

      (4) Ensure that children within the client's family and physical custody are enrolled in school, where required by law;

      (5) Ensure that the client's minor children receive appropriate supervision while on the provider's premises;

      (6) Utilize child care services when necessary to enable the adult client to seek employment or housing or to attend school or training, unless the client meets any of the exemptions of section 519g of the District of Columbia Public Assistance Act of 1982, effective April 20, 1999 (D.C. Law 12-241; D.C. Official Code § 4-205.19g), or section 5809.4(b)-(e) of Title 29 of the District of Columbia Municipal Regulations, including any subsequent revisions.

      (7) Respect the safety, personal rights, and private property of provider staff members and other clients;

      (8) Maintain clean sleeping and living areas, including bathroom and cooking areas;

      (9) Use communal areas appropriately, with attention to cleanliness and respect for the interests of other clients;

      (10) Be responsible for one's own personal property; and

      (11) Follow all Program Rules established by a provider pursuant to section 18.

  (b) Clients residing in temporary shelter and transitional housing shall participate in the provider's assessment and case management services.

Sec. 12. Common standards for all providers.
Providers shall:

      (1) Ensure staff members are appropriately trained, qualified, and supervised;

      (2) Maintain safe, clean, and sanitary facilities that meet all applicable District health, sanitation, fire, building, and zoning codes;

      (3) Assist clients to prepare for living in permanent housing, as deemed appropriate by the provider and the client;

      (4) Collaborate and coordinate with other service providers to meet the client's needs, as deemed appropriate by the provider and the client;

      (5) Receive and utilize client input and feedback for the purpose of evaluating and improving the provider's services;

      (6) Establish procedures for the provider's internal complaint procedures;

      (7) Provide clients with copies of printed information describing the range of services within the Continuum of Care;

      (8) In accordance with section 8(c) and as openings occur, inform all clients of

**ENROLLED ORIGINAL**

services for which they may be eligible;

        (9)  Deliver or provide access to culturally competent services and language assistance for clients with limited English proficiency;

        (10)  Provide services free from discrimination on the basis of race, color, religion, national origin, language, culture, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation, political affiliation, disability, and source of income, and in accordance with the Human Rights Act of 1977, effective December 13, 1977 (D.C. Law 2-38; D.C. Official Code § 2-1401 *et seq.*), the Americans with Disabilities Act of 1990, approved July 26, 1990 (104 Stat. 328; 42 U.S.C. § 12101 *et seq.*), the Rehabilitation Act of 1973, approved August 7, 1998 (112 Stat. 1095; 29 U.S.C. § 701 *et seq.*), and Title II of the Civil Rights Act of 1964, approved July 2, 1964 (78 Stat. 243; 42 U.S.C. § 2000a *et seq.*);

        (11)  Provide reasonable modifications to policies, practices, and procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the provider demonstrates that making the modifications would fundamentally alter the nature of the services;

        (12)  Ensure confidential treatment of the personal, social, legal, financial, and medical records and information related to a client or any member of a client's family, whether obtained from the client or from any other source, consistent with the confidentiality requirements of District and federal law;

        (13)  Establish Program Rules in accordance with section 18;

        (14)  Provide notice of its Program Rules in accordance with section 19;

        (15)  Collect, record, and annually report to the Mayor all complaints, including requests for fair hearings or administrative reviews, made against or related to the provider during the year; and

        (16)  Establish procedures to revise practices and policies as may be necessary to ensure that clients may access services free from discrimination on the basis of disability.

Sec. 13.  Additional standards for providers of severe weather shelter.

    In addition to the standards in section 12, providers of severe weather shelter shall provide:

        (1)  When severe weather conditions continue overnight, a clean bed with clean linens, pad, and blanket for each bed;

        (2)  Basic needs, such as food and clothing and other supportive services, or information about where to obtain such basic needs and supportive services;

        (3)  24-hour, properly functioning toilet facilities;

        (4)  Cool water, available via water cooler, fountain, or other means; and

        (5)  Properly functioning heating and cooling systems during the appropriate seasons.

Sec. 14.  Additional standards for providers of low barrier shelter.

    In addition to the requirements in sections 12 and 13, providers of low barrier shelter

**ENROLLED ORIGINAL**

shall provide:

    (1) Case management services with an appropriately trained, qualified, and supervised case manager, which shall include the development of a service plan;

    (2) Hot shower facilities; and

    (3) Personal hygiene supplies.

Sec. 15. Additional standards for providers of temporary shelter and supportive housing.

In addition to the requirements in sections 12, 13, and 14, providers of temporary shelter and supportive housing shall provide:

    (1) Assessment by an appropriately trained, qualified, and supervised case manager in order to identify each client's service needs;

    (2) Direct provision of, or referral to, appropriate supportive services to enable the client to fulfill the goals and requirements in the client's service plan;

    (3) Mail and phone services, or procedures for handling mail and phone messages, that enable the client to receive mail and messages without identifying the client as residing in temporary shelter or supportive housing;

    (4) Private, secure space for the temporary storage of personal belongings;

    (5) Access to laundry facilities in the immediate vicinity of the shelter or supportive housing facility when all of the units are in one location;

    (6) Reasonable access to phones during reasonable hours and during emergencies;

    (7) The opportunity to establish a voluntary savings or escrow account; and

    (8) In supportive housing and temporary shelters for families, access to immediate indoor or outdoor areas equipped with basic facilities for exercise and play for use by minor children.

Sec. 16. Additional standards for providers of transitional housing.

In addition to the requirements of sections 12, 13, 14, and 15, all providers of transitional housing shall provide:

    (1) Follow-up supportive services, for a minimum of 6 months, for clients who have transferred to permanent housing from their program, unless the client is receiving such supportive services from another provider;

    (2) An apartment-style or group home housing accommodation; and

    (3) Access to private space and personal time.

Sec. 17. Monitoring and inspections.

    (a) The Mayor shall monitor and evaluate the services delivered by all programs covered by section 3.

    (b) The Mayor shall inspect the premises of all providers operating programs covered by section 3. Inspections shall be conducted:

    (1) At least once during each calendar year;

    (2) Whenever the Mayor has reason to believe that a provider is not in

**ENROLLED ORIGINAL**

compliance with the applicable standards established in this act or with other requirements or agreements; and

       (3)  In a reasonable manner and during the regular hours of operation of the provider.

    (c)  During any inspection conducted pursuant to subsection (b) of this section, the provider shall make available for examination any records or other materials related to the delivery of its services, including records relating to clients and to internal complaints, in accordance with the confidentiality requirements of section 9(7).

    (d)  The Mayor shall not delegate the responsibilities of this section to any agency or entity that serves as a provider of services covered by section 3.

    Sec. 18.  Program Rules.

    (a)  Pursuant to the limitations of subsections (b) and (c) of this section, providers may establish Program Rules related to the specific goals of their programs.  The Program Rules shall include:

       (1)  Any applicable special eligibility requirements for the purpose of limiting entry into the program to individuals or families exhibiting the specific challenges that the program is designed to address, except in severe weather shelter and low barrier shelter;

       (2)  Rules regarding client responsibilities, including those listed in section 11;

       (3)  A list of client rights, including those listed in section 9, and where appropriate, section 10;

       (4)  A description of the internal complaint procedures established by the provider for the purpose of providing the client with an opportunity to promptly resolve complaints;

       (5)  A description of the procedures by which an individual with a disability may request a reasonable modification of policies or practices that have the effect of limiting the right to access services free from discrimination on the basis of disability as established by section 9(2).

       (6)  A description of the procedures and notice requirements of any internal mediation program established by the provider pursuant to section 25;

       (7)  A description of any schedule of sanctions that a provider may apply to clients who are in violation of the Program Rules, as authorized by sections 20 through 24; and

       (8)  A description of a client's right to appeal any decision or action by the provider that adversely affects the client's receipt of services through fair hearing proceedings pursuant to section 26 and administrative review proceedings pursuant to section 27.

    (b)  Any Program Rules established by a provider shall be submitted to the Mayor for approval in accordance with the following requirements:

       (1)  Within 90 days of the effective date of this act;

       (2)  On a yearly basis thereafter, with any proposed changes clearly identified; and

       (3)  Whenever a provider seeks approval to change its eligibility criteria, the rules of its internal mediation program or complaint procedures, or its schedule of sanctions.

**ENROLLED ORIGINAL**

(c)  No provider may enforce any provision within its Program Rules, other than those requirements or protections specifically enumerated by this act, unless:

(1)  The Program Rules were in existence before the effective date of this act and less than 180 days has passed since the effective date of this act; or

(2)  The Mayor has approved the Program Rules pursuant to subsection (b) of this section.

Sec. 19.  Notice.

(a)(1)  All providers shall give prompt and effective notice of their Program Rules by:

(A)  Posting a copy of their Program Rules on the provider's premises in a location easily accessible to clients and visitors; and

(B)  Giving every new client written notice of the provider's Program Rules, and reading and explaining the written notice to the client.

(2)  The client and the provider staff member delivering the notice pursuant to paragraph (1)(B) of this subsection shall both sign a statement acknowledging the client's receipt of the notice and indicating the client's awareness, understanding, and acceptance of the Program Rules.

(b)  All providers shall give to any client to whom they have denied services oral and written notice of the right to appeal the denial, including information about how to request a fair hearing pursuant to section 26 and administrative review pursuant to section 27.

(c)  All providers shall give written and oral notice to clients of their transfer to another provider or of their suspension or termination from services at least 15 days prior to the effective date of the transfer, suspension, or termination, except:

(1)  When the sanction results from the client's imminent threat to the health or safety of someone on the premises of the provider in accordance with section 24; or

(2)  When the sanction is a suspension of supportive services for a period shorter than 10 days.

(d)  Any notice issued pursuant to subsection (b) or (c) of this section must be mailed or served upon the client and shall include:

(1)  A clear statement of the sanction or denial;

(2)  A clear and detailed statement of the factual basis for the sanction or denial, including the date or dates on which the basis or bases for the sanction or denial occurred;

(3)  A reference to the statute, regulation, policy, or Program Rule pursuant to which the sanction or denial is being implemented;

(4)  A clear and complete statement of the client's right to appeal the sanction or denial through fair hearing proceedings pursuant to section 26 and administrative review proceedings pursuant to section 27, including the appropriate deadlines for instituting the appeal; and

(5)  A statement of the client's right, if any, to continuation of benefits pending the outcome of any appeal, pursuant to section 9(18).

(e)  Providers shall establish procedures to provide effective notice of rights, rules, sanctions, and denials to clients with special needs, including those who may be mentally

ENROLLED ORIGINAL

impaired or mentally ill, or who may have difficulty reading or have limited English proficiency.

Sec. 20. Transfer.

(a)  A provider may transfer a client to another provider to ensure the client receives the most appropriate services available within the Continuum of Care whenever:

(1)  The client consents to the transfer; or

(2)  The provider identifies and secures for the client a placement with another provider that more appropriately meets the client's medical, mental health, behavioral, or rehabilitative service needs in accordance with the client's service plan.

(b)  In addition to the circumstances under which a client may be transferred as described in subsection (a) of this section, a provider may transfer a client when a client fails or refuses to comply with the provider's Program Rules and the client responsibilities listed in section 11, or engages in any of the behaviors listed in section 22(2); provided, that:

(1)  The client has received proper notice of the Program Rules, client responsibilities, and prohibited behaviors, as required by section 19; and

(2)  The provider has made a good-faith effort to enable the client to comply with the Program Rules so that the client is able to continue receiving services without a transfer.

(c)  Transfers of clients under this section can be made through direct arrangements with other providers within the Continuum of Care or through coordination with the central intake center established pursuant to section 8(c)(1). Such efforts shall be documented by the provider in the client's records.

Sec. 21. Suspension.

(a)  If a client fails or refuses to comply with the provider's Program Rules and the client responsibilities listed in section 11, or engages in any of the behaviors listed in section 22(2), the provider may suspend services to the client for an appropriate period of time in light of the severity of the act or acts leading to the suspension, but in no case for any period longer then 30 days.  The suspension may be implemented only when:

(1)  The client has received proper notice of the Program Rules, client responsibilities, and prohibited behaviors, as required by section 19; and

(2)  The provider has made a good-faith effort to enable the client to comply with the Program Rules so that the client is able to continue receiving services without suspension.

(b)  Prior to suspension of services, the provider shall make a reasonable effort, given the severity of the situation, to transfer the client to another provider within the Continuum of Care, in accordance with section 20.

(c)  A provider may not suspend adult individuals or adult family members in a manner that results in minor children or dependent adults being left unattended in a shelter or supportive housing unit.

Sec. 22. Termination.

**ENROLLED ORIGINAL**

A provider may terminate its delivery of services to a client only when:

(1)  The provider documents that it has considered suspending the client in accordance with section 21 or has made a reasonable effort, in light of the severity of the act or acts leading to the termination, to transfer the client in accordance with section 20;

(2)  The client:

(A)  Possesses a weapon on the provider's premises;

(B)  Possesses or sells illegal drugs on the provider's premises;

(C)  Assaults or batters any person on the provider's premises;

(D)  Endangers the client's own safety or the safety of others on the provider's premises;

(E)  Intentionally or maliciously vandalizes, destroys, or steals the property of any person on the provider's premises;

(F)  Fails to accept an offer of appropriate permanent housing or supportive housing that better serves the client's needs after having been offered 2 appropriate permanent or supportive housing opportunities; or

(G)  Knowingly engages in repeated violations of a provider's Program Rules; and

(3)  In the case of terminations pursuant to subparagraphs (2)(F) and (2)(G) of this section, the provider has made reasonable efforts to help the client overcome obstacles to obtaining permanent housing.

Sec. 23.  Alternative sanctions.

(a)  A provider may employ lesser sanctions as alternatives to the transfer, suspension, or termination of services authorized in sections 20 through 22.

(b)  Any alternative sanction applied shall be authorized in the schedule of sanctions included in the provider's Program Rules and may include loss of special privileges and imposition of additional responsibilities.

Sec. 24.  Emergency transfers, suspensions, or terminations.

(a)  Whenever a client presents an imminent threat to the health or safety of the client or any other person on a provider's premises, the provider, in light of the severity of the act or acts leading to the imminent threat, may immediately transfer, suspend, or terminate the client, without providing prior written notice of the transfer, suspension, or termination as required by section 19(c).

(b)  The provider shall endeavor to provide written notice, consistent with the requirements of section 19(d), to any client transferred, suspended, or terminated pursuant to subsection (a) of this section at the time that the action is taken. If it is not possible or safe to provide written notice at the time of the action, a subsequent written notice shall be provided to the client within 15 days, or, if the client's whereabouts are unknown, upon request within 90 days of the transfer, suspension, or termination. The time period during which the client may request fair hearing proceedings to appeal the transfer, suspension, or termination pursuant to section 26 shall not begin until the client has received the subsequent written notice.

**ENROLLED ORIGINAL**

(c) No client transferred, suspended, or terminated pursuant to subsection (a) of this section shall have the right to request mediation of the action from the provider pursuant to section 25 or to continue to receive shelter or supportive housing services without change pending appeal pursuant to section 9(18).

(d) Whenever a provider transfers, suspends, or terminates a client pursuant to subsection (a) of this section, the provider shall immediately notify the Department of the action. The notification shall include the following information:

(1) The identity of the client who was transferred, suspended, or terminated;

(2) The nature, date, and time of the action taken by the provider;

(3) The provider staff member authorizing the transfer, suspension, or termination; and

(4) The act or acts leading to the transfer, suspension, or termination.

(e) Whenever the Department receives a notification pursuant to subsection (d) of this section, the Department shall issue a written finding of whether the emergency transfer, suspension, or termination order complies with the requirements of this section. The notification shall be issued within 24 hours of receipt of the notification by the Department. If the Department finds that the order was improperly issued, the Department shall reinstate the client's access to the services received prior to the issuance of the order, pending the outcome of a hearing pursuant to sections 26 and 27.

Sec. 25. Mediation.

(a) Providers are strongly encouraged to establish internal mediation programs to resolve disputes with clients.

(b) Any provider who chooses to establish an internal mediation program shall offer mediation services to any client of the provider, or the client's representative, who requests them.

(c) Upon receiving an oral or written request for mediation, the provider shall provide the client or the client's representative with reasonable written notice of:

(1) The time and place of any mediation proceedings; and

(2) The client's right to request a fair hearing for formal review of his or her complaint pursuant to section 26 and his or her right to request administrative review pursuant to section 27.

(d) The provider shall allow the client or the client's representative to review its records of the client prior to the mediation proceeding.

(e) The provider shall allow the client to be accompanied by a legal or other representative of the client's choosing in any mediation proceedings.

(f) Upon conclusion of the mediation proceedings, the provider shall notify the client of his or her right to request a fair hearing pursuant to section 26, and the deadline for making such a request, if he or she is not satisfied with the outcome of the mediation.

(g) No member of the provider's staff who was involved in the incident or incidents at issue in the mediation shall serve as a mediator during the proceedings.

ENROLLED ORIGINAL

Sec. 26. Fair hearings.

(a)  The Office of Administrative Hearings shall grant a fair hearing to any client or client representative who wishes to appeal a decision listed in subsection (b) of this section and who requests such a hearing, orally or in writing, within 90 days of receiving written notice of the adverse action.  A request for a fair hearing shall be made to the client's provider, the Department, the Mayor, or the Mayor's designee.  If the request is made orally, the individual receiving the request shall promptly acknowledge the request, reduce it to writing, and file the request for a fair hearing with the Office of Administrative Hearings.

(b)  A client or client representative may request a fair hearing to:

(1)  Appeal an administrative review decision made pursuant to section 27;

(2)  Review any decision of a provider of services, other than shelter or supportive housing, to:

(A)  Transfer the client to another provider;

(B)  Suspend provision of services to the client for a period longer than 10 days; or

(C)  Terminate services to the client; or

(3)  Obtain any legally available and practicable remedy for any alleged violation of:

(A)  The provider standards listed in sections 12-16; or

(B)  The client rights listed in sections 9 and 10, including the denial of a request by an individual with a disability for a reasonable accommodation or modification of policies or practices.

(c)  The Mayor shall treat a fair hearing request made by a client representative in the same manner as it would be treated if it were made directly by the client; provided,  that the Mayor subsequently receives written documentation authorizing the client representative to act on behalf of the client in accordance with the requirements of section 1004 of the District of Columbia Public Assistance Act of 1982, effective April 6, 1982 (D.C. Law 4-101; D.C. Official Code § 4-210.05).

(d)  In accordance with section 9(18), any client who requests a fair hearing within 15 days of receipt of written notice of a suspension or termination of shelter or supportive housing shall continue to receive shelter or supportive housing pending a final decision from the fair hearing proceedings.  This right to continuation of shelter or supportive housing pending appeal shall not apply in the case of an emergency suspension or termination pursuant to section 24.

(e)  Upon receipt of a fair hearing request, the Mayor or the Mayor's designee shall offer the client or client representative an opportunity for an administrative review by the Department of the decision that is the subject of the fair hearing request.

(f)  All fair hearings shall be conducted in the following manner:

(1)  In accordance with the requirements for the review of contested cases as provided in the Administrative Procedure Act;

(2)  In accordance with the Office of Administrative Hearings Establishment Act of 2001, effective March 6, 2002 (D.C. Law 14-76; D.C. Official Code § 2-1831.01 et seq.); and

(3)  In accordance with the following additional requirements:

**ENROLLED ORIGINAL**

(A) The hearing shall be held within a reasonably short time following the request, such time not to exceed 15 days following the initial request for hearing;

(B) If a party fails to appear, the Administrative Law Judge designated to conduct the hearing may enter a default decision in favor of the party present. The default may be set aside only for good cause shown, and upon equitable terms and conditions; and

(C) The Administrative Law Judge shall issue a final decision within 15 days of the completion of the hearing.

(g) Materials and documents filed with the Office of Administrative Hearings during fair hearing proceedings shall be maintained in compliance with section 16(d) of the Office of Administrative Hearings Establishment Act of 2001, effective March 6, 2002 (D.C. Law 14-76; D.C. Official Code § 2-1831.13(d)), the Health Insurance Portability and Accountability Act of 1996, approved August 21, 1996 (Pub. L. No. 104-191; 110 Stat. 1936), and any other District or federal law pertaining to confidentiality of records.

(h) The Mayor or the Mayor's designee shall maintain a file of final fair hearing and administrative review decisions, indexed by issue, with identifying information redacted. The file shall be accessible to clients, their representatives, and other persons upon request to the Mayor or the Mayor's designee.

Sec. 27. Administrative review.

(a) The purpose of the administrative review shall be to enable the Department to ascertain the legal validity of the decision that is the subject of the fair hearing request, and, if possible, achieve an informal resolution of the appeal.

(b) Any administrative review conducted pursuant to subsection (a) of this section shall be completed within 15 days of the receipt of the administrative review request, except upon showing of good cause as to why such deadline cannot be met. If good cause is shown, a decision shall be rendered as soon as possible thereafter. If an extension of time for review is required for good cause, written notice of the extension shall be provided to the client or client representative prior to the commencement of the extension.

(c) An administrative review must be completed before the Office of Administrative Hearings shall grant a fair hearing to any client or client representative.

(d) All administrative reviews shall be conducted in the following manner:

(1) In accordance with the administrative review procedures described in section 1007 of the District of Columbia Public Assistance Act of 1982, effective April 6, 1982 (D.C. Law 4-101; D.C. Official Code § 4-210.07); and

(2) In accordance with the following additional requirements:

(A) The client or client representative shall have the right to submit issues and comments in writing to the Department; and

(B) The client or the client representative shall have the right to review provider's records regarding the client, or the records of other related service providers regarding the client, prior to the administrative review proceeding;

(C) The administrative review shall be conducted by an employee of the Department;

(D) The administrative review decision shall be issued in writing, in a manner readily understood by the client, and shall include:

(i) A clear and detailed statement of the factual basis supporting the administrative review decision;

(ii) A clear and detailed statement of the actions proposed to be implemented, including any sanctions, probationary periods, or any denial, transfer, suspension, or termination of services to be imposed;

(iii) A reference to the statute, regulation, Program Rule, or policy pursuant to which the administrative review decision is made;

(iv) Notice that the client's request for a hearing shall be considered formally withdrawn upon submission of a signed statement confirming such withdrawal; and

(v) A statement that if the client is not satisfied with the administrative review decision, the fair hearing shall be held.


Sec. 28. No entitlement to services.

(a) No provision of this act shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by section 9(5).

(b) No provision of this act shall be construed to require the District to expend funds for individuals or families who are eligible for services within the Continuum of Care, beyond the level of the District's annual appropriation for services within the Continuum of Care.

Sec. 29. Limitation on use of District monies.

(a) No public funds shall be used for payment of goods or services from any vendor or organization that engages in discriminatory practices.

(b) No District funds shall be used to support the delivery of services that are not authorized by this act or by rules issued pursuant to this act.

(c) All District funds appropriated to fund or support services within the Continuum of Care shall be used in accordance with District contract and procurement regulations and District grant regulations.

Sec. 30. Contracting authority.

The Mayor may execute contracts, grants, and agreements as necessary to implement the provisions of this act.

Sec. 31. Rulemaking authority.

The Mayor, pursuant to Title 1 of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), may issue rules to implement the provisions of this act. The proposed rules shall be submitted to the Council for a 45-day period of review, excluding Saturdays, Sundays, legal holidays, and days of

ENROLLED ORIGINAL

Council recess. If the Council does not approve or disapprove the proposed rules, in whole or in part, by resolution within this 45-day review period, the proposed rules shall be deemed approved.

Sec. 32. Conforming amendments.

(a) Section 603 of the District of Columbia Public Assistance Act of 1982, effective April 6, 1982 (D.C. Law 4-101; D.C. Official Code § 4-206.03), is repealed.

Repeal § 4-206.03

(b) The District of Columbia Right to Overnight Shelter Initiative of 1984, effective March 14, 1985 (D.C. Law 5-146; D.C. Official Code § 4-701 *et seq.*), is repealed.

Repeal §§ 4-701 - 4-714

(c) The Frigid Temperature Protection Amendment Act of 1988, effective March 16, 1989 (D.C. Law 7-204; D36 DCR 454), is repealed.

(d) The Emergency Shelter Services for Families Reform Amendment Act of 1982, effective April 6, 1982 (D.C. Law 7-86; 35 DCR 140), is repealed.

(e) Section 1 of An Act To establish a District of Columbia Armory Board, and for other purposes, approved June 4, 1948 (62 Stat. 339; D.C. Official Code § 3-301), is amended by striking the phrase "such other activities as may be in the interest of the District of Columbia," and inserting the phrase "such other activities as may be in the interest of the District of Columbia, including, but not limited to, the provision of emergency protection when the temperature falls below 32 degrees Fahrenheit," in its place.

Repeal § 3-301

Sec. 33. Fiscal impact statement.

The Council adopts the fiscal impact statements of the Budget Director and the Chief Financial Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 34. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December

**ENROLLED ORIGINAL**

24, 1973 (87 Stat. 813; D.C. Official Code §1-206.02(c)(1)), and publication in the District of Columbia Register.

Chairman
Council of the District of Columbia

Mayor
District of Columbia

**washingtonpost.com**

# New Firm Urged for D.C. School Security

By V. Dion Haynes
Washington Post Staff Writer
Tuesday, May 24, 2005; B01



Advertisement

Travel smarter by the minute.

BudgetTravelOnline

Laughlin

D.C. police and government officials have recommended that the company providing security for city agencies be awarded a two-year, $30.3 million security contract at D.C. public schools, replacing the contractor that was criticized after a fatal shooting at Ballou Senior High School.

Hawk One Security Inc., a 20-year-old company based in the District, would replace Watkins Security Agency of D.C. on July 1 if the D.C. Council approves the recommendation.

The February 2004 shooting of James Richardson, 17, at Ballou sparked heightened scrutiny of the school system's three-year, $45.6 million contract with Watkins and prompted the council to shift authority over school security from the school system to the D.C. police department last summer. At several public hearings last year, parents from across the city complained that Watkins did not have enough personnel to patrol large school buildings.

But at a hearing of the council's public safety and education committees yesterday, school officials and some council members expressed concern that the new arrangement -- in which the police department manages security and the school system pays for it -- will be unwieldy and could wind up costing more money.

Edward D. Reiskin, deputy mayor for public safety and justice, told the council that the second year of the proposed contract with Hawk One would cost $15.1 million, more than the $10.2 million in the school system's budget. He said the city, not the schools, probably would make up the shortfall.

"Who will be responsible and who will be to blame when there is a problem?" asked council member Carol Schwartz (R-At Large). "Will there be money to pay the security guards in the schools when we're through?"

Board of Education President Peggy Cooper Cafritz said she feared the arrangement would cause the school system to incur expenses over which it had no control. She said Superintendent Clifford B. Janey is developing a plan under which the school system would regain oversight and hire its own security guards when the contract with Hawk One is up in 2007.

Putting the police department in charge of school security, Cafritz said, "creates a receiver relationship in that [the Metropolitan Police Department] has the authority to write checks against DCPS's budget. MPD approves extra services and can authorize overtime and the board has to pay the bill."

She added that the District spends more for school security than any other school system in the nation. "This,

to me, drives the question of how quickly we need to move the service in-house with well-trained people," she said.

At the hearing, police officials outlined their strategy for protecting students. They said the personnel supervising the Hawk One security guards will include 14 sergeants and 99 school resource officers. They also said they will pay the guards $1 an hour more than the Watkins guards are paid to draw a high-quality workforce.

"From the tragic shooting death of James Richardson inside Ballou Senior High School 15 months ago to any number of incidents of school violence, we know that crime problems in our neighborhoods often end up in the schools -- and vice versa," Deputy Police Chief Margaret Poethig said.

The police department "is working hard to prevent this spillover between schools and neighborhoods by fully integrating school safety into our broader strategy" of community policing, she added.

In addition to complaints that Watkins did not patrol buildings adequately, parents have alleged that some Watkins guards acted unprofessionally by escorting students to proms and supplying them with alcohol. Watkins officials have denied the allegations.

"We feel Watkins is being scapegoated. . . . It's not the vendor who needs improving but the school system," Donna Henry, a spokeswoman for Watkins, said in an interview yesterday.

Council member Adrian M. Fenty (D-Ward 4) urged police not to rehire guards from Watkins. "If you know the schools, these people are not very good," he said.

*Staff researcher Bobbye Pratt contributed to this report.*

© 2005 The Washington Post Company

**Ads by Google**

**MD, DC, VA temp staff**
Performance based references not just confirming dates
www.hirestandard.com

**Employment screening**
Helping you make hiring decisions Free hiring process solutions
www.backgroundprofiles.com

**Free Background Checks**
Free results available instantly. Unlimited searches and results.
www.Free-Background-Checks.ws

Home Page > News > Local > Local Stories

January 4th, 2007

# Special Officer Wanted on Prior Domestic Charge

Jul 12th - 3:22pm
Neal Augenstein, WTOP Radio

WASHINGTON -- A special police officer -- charged with two armed robberies in Georgetown Friday -- was wanted on a different charge before he was hired to protect city government buildings.

WTOP Radio has learned there was a warrant for Xavier Brooks on a domestic assault charge before the night he allegedly used his .38 caliber gun to rob two people in the 2800-block of Dumbarton Street in Northwest.

So why was Brooks carrying a gun, wearing a badge and protecting D.C. buildings when there was a warrant for his arrest? His employer, Hawk One Security, says it was unaware of the warrant when it hired Brooks one month ago.

The company says D.C. Police never provided any information about the warrant, but the company acknowledges it could have done its own separate background check.

Lieutenant Jon Shelton, of the licensing branch of Metropolitan Police Department would not comment on this particular case. He says, in general, a special police officer goes through a thorough background check yearly. If a commissioned SPO is arrested, he is required to notify his employer and MPD, and police immediately revoke the license, pending the investigation.

Hawk One and police officials acknowledge it is possible that Brooks was never aware of the outstanding warrant.

Police say Brooks used his service revolver to demand a man's wallet while his co-defendant pointed a gun at a woman and took her purse.

After the crime, police put out a lookout and arrested both men during a traffic stop.

They were stopped at a traffic light on M Street, NW, at 30th Street. The arresting officer says "the defendant and co-defendant were breathing very heavy and sweating," according to the charges.

When Brooks handed over his identification that said he was a special police officer, the officer asked him whether he was armed and he replied that he was.

The charges say police found the service revolver in a black nylon bag on the floor of the vehicle.

They also found the co-defendant's gun.

As a special police officer, Brooks had the authority under D.C. law to make arrests and to take his service weapon home.

Hawk One tells WTOP that Brooks provided security for the D.C. Department of Human Services on New York Avenue in Northeast.

(Copyright 2005 by WTOP Radio. All Rights Reserved.)

Home | Site Map | Advertise with Us |  Contact Us | Privacy Statement | EEO Public File Report    < Back

AP material Copyright 2006 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

washingtonpost.com

# Security Guard Charged in Robbery

### D.C. Man Had Worked at City's Human Services Building

By Nia-Malika Henderson
Washington Post Staff Writer
Wednesday, July 13, 2005; B05

A private security guard assigned to watch over a D.C. government building has been charged with an armed robbery in Georgetown last weekend, police said.

Xavier D. Brooks, 34, has been suspended from his job at Hawk One Security Inc., a company official said yesterday. Brooks began work there a month ago, stationed at the D.C. Department of Human Services, the official said.

Advertisement



DC LUCKY NUMBERS    ❶ PAUSE    ◉ SOUND ON

Hawk One, which has provided security for D.C. government buildings, recently won a two-year, $30 million contract to handle those duties for D.C. public schools.

Brooks and an uncle, Antwane Brooks, 33, are charged with robbing a man and woman shortly after 4 a.m. Saturday in the 2800 block of Dumbarton Street NW. Police said both men were brandishing revolvers belonging to the security firm. The man surrendered a wallet and the woman gave up her purse in the attack, police said.

The men were arrested within minutes and two guns were recovered from their car, along with the wallet and purse, police said. According to charging papers, both gave statements to police in which they admitted robbing the victims. The charging papers quoted Xavier Brooks as telling police that the two drove to Georgetown after Antwane Brooks committed an earlier robbery in Southwest Washington; no charges were filed in that incident.

Brooks, of Southeast Washington, and his uncle, of Richmond, are jailed without bond pending a hearing Friday in D.C. Superior Court. The arrests were reported yesterday by WTOP Radio.

April Hill, a spokeswoman for Hawk One, said that Xavier Brooks started work in June after working for another security firm. She said he was cleared to work by a D.C. police board that does background checks of security officers. A report by the D.C. Pretrial Services Agency, prepared after Xavier Brooks was arrested, shows no previous convictions.

"We had not gotten anything that raised a red flag about Mr. Brooks," Hill said.

John T. Harvey, a lawyer for Xavier Brooks, declined comment yesterday. The D.C. Public Defender Service, representing Antwane Brooks, did not return a telephone message seeking comment.

A D.C. police official overseeing school security said guards working in the schools are required to go through more scrutiny -- before and after they are hired -- than those assigned to other government buildings.

School security guards "go through a whole different level of security, including random drug testing and monitoring," said Assistant Chief Gerald M. Wilson of the police department's office of security services. "I'm confident our screening process will ensure that we have qualified people to be in the schools."

Board of Education Vice President Carolyn N. Graham expressed concern yesterday about the arrest. "It's something we're going to have to monitor," she said.

Hawk One's school security contract was allowed to begin July 1 despite a protest from the second-place bidder seeking to have the deal withdrawn. Watkins Security of D.C. argued that Hawk One should have lost the bid because of several tax liens against it. An official with the D.C. Contract Appeals Board said the protest is pending, and a decision should be made in about a month.

*Staff writers V. Dion Haynes and Del Quentin Wilber contributed to this report.*

© 2005 The Washington Post Company

Ads by Google

**Personal security items**
Alarms, safety lights, and more Secure ordering, fast shipping
www.DefenseXpress.com

**New Panda Platinum 2007**
AntiSpam, Parental Control, AntiPhising and 3 licenses: $43.95
www.pandasoftware.com

**MD Security Service**
Private, Uniformed Security Teams The Protection Every Client Needs
www.iwgprotection.com

washingtonpost.com

# D:C.'s Compassion Stretches Only So Far

By Courtland Milloy
Monday, September 12, 2005; B01



Advertisement

MULTITASK THIS YEAR
WITH THE BLACKBERRY
7100i.

> Built-in Nextel Walkie-Talkie
> Wireless access to email & Web
> GPS & Bluetooth enabled

Buy now >

NEXTEL
only from Sprint

The District's largest emergency shelter for homeless families is called D.C. Village. But don't let the quaint-sounding name fool you. The shelter sits next to a junkyard and close to a sewage treatment plant at the city's southwestern tip, long regarded as a dumping ground.

"When they stuck us out here, they knew exactly what they were doing," said Miss Avis, a name she used to protect the identity of her children. "All us black people, like, they put us somewhere we can be forgotten."

The shelter is home to about 68 families, including about 100 children. The air is rife with junkyard dust and stench from the Blue Plains Wastewater Treatment Facility. The ground is contaminated -- a "brownfield," as environmentalists call it -- toxic, but supposedly not serious enough to be considered a hazard. At least not as far as the health of these homeless families is concerned.

"This place is health epidemic central," said Miss Princess, mother of two. "You name it, we got it: pinworm, skin rash, headache, asthma, spider bites, bedbugs . . . "

"Don't forget the roaches," another resident chimed in.

There was a rare moment of joy at the shelter yesterday when volunteers from the Homeless Children's Playtime Project showed up with toys and games. Children ran up to their favorite volunteers, hugged them and continued holding on as if for dear life. When the volunteers began dispensing toys and bags of nuts and fruit, the children cheered. They also brought them containers of cold, filtered water to drink, a luxury compared with what flows out of those dirty, leaking shelter faucets.

"We were having behavior problems with some of the children until we realized they hadn't eaten all day," said Jamila Larson, coordinator of the playtime project. "Now we bring nutritious food and cold, clean water, and we don't have those problems anymore."

Asked how the children feel when their once-a-week, two-hour playtime is over, Larson said, "We've had children hop in our cars and try to leave with us."

To better understand the treatment of residents at D.C. Village, consider the reception given to those who were rescued from the floodwaters in New Orleans last week and brought to live in the D.C. Armory on Capitol Hill. They were greeted with balloons, handshakes and applause from city officials; given medical attention, including mental health counseling; and assigned a cadre of emergency workers to help them get back on their feet. They receive three meals a day, access to computers, help getting children into schools, help filling out applications for public assistance and help writing résumés.

A job fair is planned for them, and affordable housing is being arranged. D.C. Council member David A. Catania (I-At Large) said his office plans to compile a calendar that will list the various barbecues, other dinners, church outings, zoo trips and other social events being organized for the evacuees by area residents and nonprofit groups.

Told about this, residents at D.C. Village said they were happy for the evacuees. They said they knew how bad it feels to lose everything and they could only imagine how good it must feel to have so many people care so much.

"I wish somebody would adopt me," Miss Princess said.

A teenager was asked what improvements she'd like to see at D.C. Village: "Food that's edible."

Her friend added, "It's like nursing home food, only not sanitary."

A boy who was bouncing a worn-out basketball said, "I want to be on a football team." His mother put her arms around him and said: "The children just want to be children. But they can't be children here."

The slow response of the federal government to victims of Katrina had shamed America around the world. Now the nation's capital was attempting to refurbish that image, with D.C. officials seeming to be in competition with other cities to show the most compassion for the homeless evacuees. The deadly storm had succeeded in turning the impoverished poor of New Orleans into "innocent victims" and helped a nation see them in a more sympathetic light.

And yet, at the same time, D.C. Village is a reminder of the contempt with which we still hold people like them and the lengths we go to keep them and the suffering out of sight.

*E-mail:milloyc@washpost.com*

© 2005 The Washington Post Company

Ads by Google

**Relief Worker Positions**
Professional Operators wanted for disaster relief deployments CONUS
www.gsaert.com

**Charity jobs**
Wide Range of Charity Organizations Info- Charity jobs
www.CharityOrganizations.com

**UN, NGOs, Non-Profit Jobs**
5800 Recruiters and 9500+ jobs/year 990 jobs taken up: Value Membership
www.devnetjobs.org



**U.S. Department of Justice**

**Jeffrey A. Taylor**
*United States Attorney*
*for the District of Columbia*

Judiciary Center
555 4th Street, N.W.
Washington, D.C. 20530

### PRESS RELEASE

**FOR IMMEDIATE RELEASE**
**Wednesday, September 21, 2005**

For Information, Contact Public Affairs
Channing Phillips (202) 514-6933

## Special police officer and his uncle plead guilty to armed robbery and robbery

**Washington, D.C.** - United States Attorney Kenneth L. Wainstein announced that Xavier Brooks, 35, who was a special police officer, and his uncle, Antwane Brooks, 34, have entered guilty pleas in the Superior Court for the District of Columbia in connection with several armed robberies they committed on July 9, 2005. On Monday, September 19, 2005, Xavier Brooks pled guilty to armed robbery with an operable pistol and robbery. One week earlier, on September 12, 2005, Antwane Brooks pled guilty to the same charges. Under the terms of the plea agreement, both defendants, who reside in Capitol Heights, Maryland, face a maximum of 43 years of incarceration when sentenced before the Honorable Wendell P. Gardner, Jr. in November.

According to the government's evidence, in the early morning hours of July 9, 2005, Xavier Brooks drove Antwane Brooks to Southwest Washington near the Mall to commit an armed robbery. At approximately 3:20 a.m., after being dropped off by Xavier Brooks, Antwane Brooks pointed a loaded gun at a woman walking on M Street, and robbed her of her purse, wallet, credit cards, a cell phone and cash. Xavier Brooks subsequently drove Antwane Brooks to Georgetown, where the defendants planned to commit more robberies. At approximately 4:10 a.m., both defendants left their vehicle and approached a man and woman walking together in the 2800 block of Dumbarton Street, NW. Xavier Brooks approached the man, and robbed him of his wallet at gunpoint. Antwane Brooks then robbed the woman of her purse, also at gunpoint. The defendants then left the area in their vehicle.

Police responded to the scene of the Georgetown robberies and broadcast the defendants' descriptions as provided by the victims to these robberies. Metropolitan Police Department Officer Michael Handy subsequently saw two men matching the defendants' descriptions in a vehicle on M Street, NW. Officer Handy pulled up next to the vehicle, and after noticing that both men were sweating and breathing heavily, made a traffic stop of their car. Xavier Brooks provided his Special Police Officer's identification card along with his driver's license and registration. Officer Handy asked Xavier Brooks if he was armed, and Xavier Brooks admitted that he was, at which point Officer Handy saw a black .38 caliber revolver in a bag between the legs of Antwane Brooks, who was seated in the front passenger seat.

Police recovered an additional black .38 caliber revolver from the vehicle, along with the purse of the woman robbed earlier that morning on the Mall, and the purse and wallet of the couple robbed shortly thereafter in Georgetown. The man and woman robbed in Georgetown were brought to the location where the defendants were stopped, and both victims identified the defendants as the individuals who had just robbed them at gunpoint.

Detective Neil Jones interviewed both defendants, who fully confessed their roles in the armed robberies.
In announcing the guilty pleas, United States Attorney Wainstein praised the investigative efforts of Metropolitan Police Department Detective Neil Jones and Officer Michael Handy. He also commended Assistant United States Attorney Alexander D. Shoaibi, who prosecuted the case.

**WTOP**    **Washington's News, Traffic & Weather**    Now On 103.5 FM

103.5 FM 820 AM

SEARCH Google

Home Page > News > Local > Local Stories

January 4th, 2007

# D.C .Police Admit 'Human Error' in Gun Screening

Oct 31st - 3:41pm
Neal Augenstein , WTOP Radio

WASHINGTON- D.C Police say the reason an armed Special Police Officer, who eventually pleaded guilty to robbing a couple in Georgetown, was allowed to carry a gun in the first place was because of human error.

WTOP has learned two Metropolitan Police Department officers have been disciplined for failing to notice that Xavier Brooks was wanted by police at the same time he was applying to be an armed special police officer.

Several local and federal sources say the information about Brooks' domestic warrant was on the notification system used by area law enforcers, but the officers never noticed it.

Lt. Jon Shelton, of the M.P.D.'s Security Officers Management Branch says he's added two more steps in the verification process to make sure this mistake is never repeated.

Shelton would not describe how the officers were disciplined, but he says they remain on the force.

Xavier Brooks pleaded guilty in September to felony robbery while armed with a .38 caliber service revolver. He's also admitted to being the driver earlier that night while his uncle committed another robbery.

He's due to be sentenced November 30. The judge says Brooks can expect to do at least seven years in jail, and he could get up to 45 years.

As for a motive, Brooks says he and his uncle went to Georgetown that night with the goal of robbing people.

(Copyright 2005 WTOP Radio. All rights reserved.)

< Back

Home | Site Map | Advertise with Us | Contact Us | Privacy Statement | EEO Public File Report

AP material Copyright 2006 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# Security firm hit with new tax lien

By Jim McElhatton
THE WASHINGTON TIMES
January 5, 2006

The D.C.-based company that posts hundreds of guards in city schools and other government buildings is facing a new federal tax lien for unpaid balances totaling more than $1.4 million, according to recent government records.

The Internal Revenue Service filed the lien in November against Hawk One Security Inc. for delinquent taxes between 1998 to 2002. The filing became public record last week at the D.C. Office of the Recorder of the Deeds.

The tax troubles come months after Hawk One executives said the company was close to negotiating the settlement of federal liens that stemmed from financial difficulties experienced under previous management more than a decade ago.

The Metropolitan Police Department, which oversees Hawk One, said yesterday it had not seen any evidence that financial difficulties affected the company's performance in the schools.

"No matter how they've done it, they've gotten to where they need to be," D.C. Assistant Police Chief Gerald Wilson said. "We're working well with Hawk One to provide for the safety of the students, teachers and staff."

IRS officials yesterday declined to comment on the filing, saying disclosure regulations do not permit officials to comment on the status of any individual tax matters.

Hawk One officials did not return phone messages regarding the lien yesterday.

The company was awarded the two-year, roughly $30 million school security contract last summer. It also received a separate contract for about $14 million to guard city government buildings.

Hawk One officials have previously stated that their finances are solid and that any outstanding tax liens were incurred largely as a result of problems during the 1990s when the District was slow to pay its contractors.

However, some school officials last year expressed concern about Hawk One's financial stability after they heard about complaints from guards about not being paid on time and a background check by the city's contracting office showed prior tax problems.

The company blamed the guards' pay problems on an accounting mix-up.

Hawk One's finances also came under scrutiny from a competing contractor, Watkins Security Agency of D.C. Inc., which held the school security contract last year.

The company challenged the Hawk One contract, citing bidding improprieties and questions over Hawk One's finances. The D.C. Contract Appeals Board ordered the District to rebid the contract or re-evaluate offers submitted by the finalists.

Despite the tax problems, Chief Wilson said yesterday that school security is improving since oversight of the contract was transferred from the school system to the police department.

"Suffice to say, we've had some incidents in the schools, but we certainly have not had incidents that have risen to the level we had prior to making the Metropolitan Police Department responsible for school security," Chief Wilson said.

Metropolitan

# School security remains questionable

By Jim McElhatton
THE WASHINGTON TIMES
July 18, 2006

D.C. public schools, which have endured criticism and scrutiny of their security, continue to struggle with guards fraternizing with students and radios that cannot communicate, community and school leaders say.

Their concerns are being aired on the heels of eight government audits highlighting problems in school security in the past few years and last year's takeover of school security operations by the Metropolitan Police Department.

"It's kind of ridiculous to walk in at 4:30 [p.m.] and see everything wide open," Cathy Reilly, director of the Senior High Alliance of Parents, Principals and Educators, testified Friday during a D.C. Council hearing on school security. "There's nobody there."

Marlene Berlin, a member of Wilson High School's local restructuring team, said the transition of security from the school system to the police department "has not gone very well, frankly."

Security officers "flow in and out of the school" without the principal being notified, and some officers refuse to deploy under the principal's orders, said Miss Berlin, who was testifying on behalf of Principal Stephen P. Tarason.

"Teachers are concerned about the level of fraternization between security officers and students," she said.

Friday's oversight hearing was convened by council members Kathy Patterson, Ward 3 Democrat and chairwoman of the Education, Libraries and Recreation Committee, and Phil Mendelson, at-large Democrat and chairman of the Judiciary Committee.

Assistant Metropolitan Police Chief Gerald Wilson, who oversees school security, said he has not heard any complaints about guards fraternizing with students since the department took over security last year.

"We want the security personnel to be mentors, to get to know the young people," Chief Wilson said. "They're going to have to have some type of cordial conversation. Is that fraternization? I don't know."

Chief Wilson defended his department's role, saying schools now operate in a "safe, stable manner."

The hundreds of security guards in the school system are privately employed through D.C.-based Hawk One Security Inc., but the police department supervises them.

Hawk One officials did not testify at the hearing, and the company did not respond to phone messages yesterday.

Copyright © 1999 - 2006 News World Communications, Inc.
http://www.washingtontimes.com/metro/20060717-103555-7726r.htm

# Metropolitan

## School security remains questionable

By Jim McElhatton
THE WASHINGTON TIMES
July 18, 2006

   Several members of the D.C.-based nonprofit Peaceoholics Inc. testified about concerns over school security arrangements.

   Chief Wilson noted several successful measures since the police took over security, such as new youth advisory councils, a gang inventory and daily conference calls to discuss school security involving officials from the school system, the police department and the Washington Metropolitan Area Transit Authority.

   In addition, Chief Wilson said, officers more closely scrutinize security personnel to ensure they don't have criminal backgrounds or positive drug tests, noting that more than 50 people have been disqualified from working on the contract.

   A report by the D.C. Office of the Inspector General last year found that some guards were certified by the police department, despite having criminal records that should have disqualified them.

   A recurring problem has been the inability of contract security guards to communicate with police officers, Miss Reilly said.

   "Radios and walkie-talkies can't talk to each other," she said. "They're just not coordinated. ... It's an expensive problem, but it's crucial."

   Thomas Brady, chief business administrator for the school system, said officials have applied for a $500,000 homeland security grant for radio equipment.

Copyright © 1999 - 2006 News World Communications, Inc.
http://www.washingtontimes.com/metro/20060717-103555-7726r.htm

# DC Central Kitchen, Inc.
# and Affiliate

Consolidated Financial Statements
and
Independent Auditors' Report

## December 31, 2005 and 2004

## CONTENTS

| | |
|---|---|
| Independent Auditors' Report | 1 |
| Financial Statements: | |
| Consolidated Statements of Financial Position | 2 |
| Consolidated Statement of Activities – 2005 | 3 |
| Consolidated Statement of Activities – 2004 | 4 |
| Consolidated Statement of Functional Expenses – 2005 | 5 |
| Consolidated Statement of Functional Expenses – 2004 | 6 |
| Consolidated Statements of Cash Flows | 7 |
| Notes to Consolidated Financial Statements | 8-13 |
| Supplemental Information: | |
| Schedule of Consolidated Summary of Functional Expenses – 2005 | 14 |

# Kattell and Company, P.L.L.C.

*Serving the Nonprofit Community*

4055 NW 43rd Street, Suite 28     Gainesville, Florida 32606     TEL: 352-395-6565     FAX: 352-395-6636     www.kattell.com

## INDEPENDENT AUDITORS' REPORT

Board of Directors
DC Central Kitchen, Inc.
Washington, DC

We have audited the accompanying consolidated statement of financial position of DC Central Kitchen, Inc. and affiliate (the Organization) as of December 31, 2005, and the related consolidated statements of activities, cash flows, and functional expenses for the year then ended. These consolidated financial statements are the responsibility of the Organization's management. Our responsibility is to express an opinion on these financial statements based on our audit. The 2004 consolidated financial statements were audited by other auditors whose report dated April 15, 2005 expressed an unqualified opinion on those financial statements.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of DC Central Kitchen, Inc. and affiliate, as of December 31, 2005, and the changes in their net assets and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

Our audit was made for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The Schedule of Consolidated Summary of Functional Expenses – 2005 is presented for purposes of additional analysis and is not a required part of the basic consolidated financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole.

*Kattell and Company, PLLC*

March 31, 2006
Gainesville, Florida

*"Not everything that counts can be counted, and not everything that can be counted counts."*
- Albert Einstein

- 1 -

# Consolidated Statements of Financial Position
## December 31, 2005 and 2004
## DC Central Kitchen, Inc. and Affiliate

| | | 2005 | 2004 |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash | | $ 25,462 | $ 134,022 |
| Inventory | | 7,707 | 7,248 |
| Accounts Receivable | | 142,963 | 92,591 |
| Contributions Receivable, Current Portion | | 242,750 | 453,016 |
| Grants Receivable | | 16,891 | 12,027 |
| Prepaid Expenses | | 21,677 | 33,658 |
| **Total Current Assets** | | 457,450 | 732,562 |
| | | | |
| **Contributions Receivable,** net of Current Portion | | 125,000 | 325,000 |
| | | | |
| **Fixed Assets:** | | | |
| Kitchen Equipment | | 55,115 | 66,225 |
| Office and Other Equipment | | 23,087 | 28,878 |
| Vehicles | | 215,850 | 235,780 |
| Less: Accumulated Depreciation | | (180,999) | (195,843) |
| **Net Fixed Assets** | | 113,053 | 135,040 |
| | | | |
| **Total Assets** | | **$ 695,503** | **$ 1,192,602** |

| | | | |
|---|---|---|---|
| **Liabilities and Net Assets** | | | |
| **Current Liabilities:** | | | |
| Accounts Payable | | $ 141,167 | $ 78,716 |
| Accrued Payroll and Leave | | 129,554 | 116,304 |
| Deferred Revenue | | -- | 20,878 |
| Line of Credit | | 37,000 | -- |
| Capital Lease Obligations, Current Portion | | 16,374 | 24,441 |
| **Total Current Liabilities** | | 324,095 | 240,339 |
| | | | |
| **Capital Lease Obligations,** net of Current Portion | | 39,570 | 55,730 |
| | | | |
| **Total Liabilities** | | 363,665 | 296,069 |
| | | | |
| **Net Assets:** | | | |
| Unrestricted | | 6,838 | 171,914 |
| Temporarily Restricted | | 325,000 | 724,619 |
| **Total Net Assets** | | 331,838 | 896,533 |
| | | | |
| **Total Liabilities and Net Assets** | | **$ 695,503** | **$ 1,192,602** |

See accompanying notes.

## Consolidated Statement of Activities
## For the Year Ended December 31, 2005
## DC Central Kitchen, Inc. and Affiliate

|  | Unrestricted | Temporarily Restricted | Total |
|---|---|---|---|
| **Support and Other Revenue:** |  |  |  |
| Contributions | $ 1,195,173 | $      -- | $ 1,195,173 |
| Federal Government Grants and Contracts | 105,087 | -- | 105,087 |
| Other Contracts | 808,340 | -- | 808,340 |
| United Way | 148,604 | -- | 148,604 |
| Retail Food | 502,324 | -- | 502,324 |
| Special Events | 221,883 | -- | 221,883 |
| Other Income | 15,669 | -- | 15,669 |
| Donated Goods and Services | 3,003,956 | -- | 3,003,956 |
| Net Assets Released From Restrictions | 399,619 | (399,619) | -- |
| **Total Support and Other Revenue** | **6,400,655** | **(399,619)** | **6,001,036** |
| **Expenses:** |  |  |  |
| Program Services: |  |  |  |
| Food Recycling/Meal Distribution | 2,662,902 | -- | 2,662,902 |
| Culinary Job Training | 808,962 | -- | 808,962 |
| First Helping | 466,104 | -- | 466,104 |
| Fresh Start Catering | 514,243 | -- | 514,243 |
| New Beginnings | 600,301 | -- | 600,301 |
| National R&D | 87,265 | -- | 87,265 |
| Campus Kitchens Project | 710,702 | -- | 710,702 |
| Total Program Services | 5,850,479 | -- | 5,850,479 |
| Support Services: |  |  |  |
| Management and General | 298,674 | -- | 298,674 |
| Direct Donor Benefits | 73,317 | -- | 73,317 |
| Development | 343,261 | -- | 343,261 |
| Total Support Services | 715,252 | -- | 715,252 |
| **Total Expenses** | **6,565,731** | **--** | **6,565,731** |
| **Change in Net Assets** | **(165,076)** | **(399,619)** | **(564,695)** |
| **Net Assets, January 1, 2005** | **171,914** | **724,619** | **896,533** |
| **Net Assets, December 31, 2005** | **$      6,838** | **$   325,000** | **$ 331,838** |

See accompanying notes.

-3-

# Consolidated Statement of Activities
## For the Year Ended December 31, 2004
## DC Central Kitchen, Inc. and Affiliate

|  | Unrestricted | Temporarily Restricted | Total |
|---|---|---|---|
| **Support and Other Revenue:** |  |  |  |
| Contributions | $   609,014 | $ 1,033,904 | $ 1,642,918 |
| Federal Government Grants and Contracts | 97,692 | -- | 97,692 |
| Other Contracts | 706,666 | -- | 706,666 |
| United Way | 110,609 | 51,500 | 162,109 |
| Retail Food | 599,325 | -- | 599,325 |
| Special Events | 168,615 | -- | 168,615 |
| Other Income | 14,997 | -- | 14,997 |
| Donated Goods and Services | 3,252,867 | -- | 3,252,867 |
| Net Assets Released From Restrictions | 824,880 | (824,880) | -- |
| **Total Support and Other Revenue** | **6,384,665** | **260,524** | **6,645,189** |
| **Expenses:** |  |  |  |
| Program Services: |  |  |  |
| Food Recycling/Meal Distribution | 2,694,577 | -- | 2,694,577 |
| Culinary Job Training | 845,360 | -- | 845,360 |
| First Helping | 445,371 | -- | 445,371 |
| Fresh Start Catering | 573,133 | -- | 573,133 |
| New Beginnings | 609,489 | -- | 609,489 |
| National R&D | 142,232 | -- | 142,232 |
| Campus Kitchens Project | 772,664 | -- | 772,664 |
| Total Program Services | 6,082,826 | -- | 6,082,826 |
| Support Services: |  |  |  |
| Management and General | 150,328 | -- | 150,328 |
| Direct Donor Benefits | 90,945 |  | 90,945 |
| Development | 282,124 | -- | 282,124 |
| Total Support Services | 523,397 | -- | 523,397 |
| **Total Expenses** | **6,606,223** | **--** | **6,606,223** |
| **Change in Net Assets** | **(221,558)** | **260,524** | **38,966** |
| **Net Assets, January 1, 2004** | **393,472** | **464,095** | **857,567** |
| **Net Assets, December 31, 2004** | **$   171,914** | **$   724,619** | **$   896,533** |

See accompanying notes.

**Consolidated Statement of Functional Expenses**
**For the Year Ended December 31, 2005**
**DC Central Kitchen, Inc. and Affiliate**

| | Program Services | | | | | | | | Support Services | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Food Recycling/Meal Distribution | Culinary Job Training | First Helping | Fresh Start Catering | New Beginnings | National R&D | Campus Kitchens Project | Total Programs | Management and General | Direct Donor Benefits | Development | |
| Personnel | $ 562,148 | $ 197,489 | $ 243,466 | $ 269,569 | $ 224,822 | $ 74,357 | $ 277,994 | $ 1,849,845 | $ 197,842 | $ -- | $ 148,804 | $ 2,196,491 |
| Kitchen Costs | 65,653 | 20,438 | 3,435 | 73,265 | 41,078 | 31 | 3,077 | 206,977 | -- | -- | -- | 206,977 |
| Donated Kitchen Costs | 3,833 | -- | -- | -- | -- | -- | -- | 3,833 | -- | -- | -- | 3,833 |
| Donated Equipment | 500 | -- | 1,000 | -- | -- | -- | -- | 1,500 | -- | -- | -- | 1,500 |
| Food and Beverage Purchased | 92,736 | 42,812 | 5,629 | 110,547 | 257,795 | 117 | 14,130 | 523,766 | 222 | -- | -- | 523,988 |
| Donated Food and Beverage | 1,589,600 | 465,804 | 129,177 | -- | 17,723 | -- | 210,888 | 2,413,192 | -- | -- | -- | 2,413,192 |
| Vehicle Expense | 68,838 | -- | 9,184 | 8,810 | 12,441 | 39 | 71 | 99,383 | 69 | -- | -- | 99,452 |
| Donated Vehicle Expense | 1,347 | -- | -- | -- | -- | -- | -- | 1,347 | -- | -- | -- | 1,347 |
| Program Expense | 208 | 49,317 | 6,086 | -- | 225 | -- | 16,101 | 71,937 | -- | -- | -- | 71,937 |
| Donated Program Expense | -- | -- | 4,860 | -- | -- | -- | -- | 4,860 | -- | -- | -- | 4,860 |
| Events | -- | 950 | -- | 754 | -- | -- | 343 | 2,047 | 125 | 18,317 | 96,319 | 116,808 |
| Donated Event Expense | -- | 1,200 | -- | -- | -- | -- | -- | 1,200 | -- | 55,000 | 58,850 | 115,050 |
| Professional Services | 9,514 | 5,127 | 7,364 | 1,265 | 602 | 633 | 1,265 | 25,770 | 80,956 | -- | 3,381 | 110,107 |
| Donated Professional Services | 14,423 | 2,621 | 6,005 | 3,749 | 4,377 | 664 | 36,164 | 68,003 | 2,766 | -- | 1,559 | 72,328 |
| Internships | -- | -- | -- | -- | -- | -- | 15,360 | 15,360 | -- | -- | -- | 15,360 |
| Technology and Communications | 238 | -- | 2,437 | 40 | -- | 388 | 2,951 | 6,054 | 12,700 | -- | 1,184 | 19,938 |
| Donated Tech. and Comm. | 1,615 | 294 | 672 | 420 | 490 | 74 | 3,565 | 3,565 | 310 | -- | 175 | 4,050 |
| Depreciation | 22,163 | 1,721 | 1,803 | 5,284 | 5,239 | -- | 62 | 36,272 | 1,940 | -- | -- | 38,212 |
| Building Maintenance | 191 | -- | -- | -- | -- | -- | -- | 191 | 1,906 | -- | -- | 2,097 |
| Donated Rent | 168,000 | 12,000 | 24,780 | 21,600 | 21,600 | 2,400 | 102,322 | 352,702 | 11,595 | -- | 6,795 | 371,092 |
| Donated Storage Space | 1,704 | -- | -- | -- | -- | -- | -- | 1,704 | -- | -- | -- | 1,704 |
| Insurance, other than Vehicle | 400 | 1 | -- | 2,695 | 2,809 | 2,121 | 3,547 | 8,763 | 18,774 | -- | 4,317 | 27,537 |
| Interest and Bank Fees | 11,235 | -- | -- | 1,285 | 293 | 104 | -- | 15,330 | 11,408 | -- | -- | 31,539 |
| Office Expense | 4,331 | 1,872 | 3,159 | 861 | -- | 4,622 | 4,069 | 14,689 | 37,287 | -- | 15,674 | 67,650 |
| Travel and Local Business | 1,084 | 101 | 3,188 | 693 | -- | 108 | 14,340 | 24,028 | 952 | -- | 726 | 25,706 |
| Miscellaneous | 9,207 | 45 | 465 | 1,882 | 86 | 1,607 | 3,613 | 15,406 | 6,429 | -- | 1,625 | 23,460 |
| Shared Expense Allocation | 33,934 | 7,170 | 13,394 | 11,524 | 10,721 | -- | 4,405 | 82,755 | (686,607) | -- | 3,852 | -- |
| | $ 2,662,902 | $ 808,962 | $ 466,104 | $ 514,243 | $ 600,301 | $ 87,265 | $ 710,702 | $ 5,850,479 | $ 298,674 | $ 73,317 | $ 343,261 | $ 6,565,731 |

See accompanying notes.

-5-

## Consolidated Statement of Functional Expenses
### For the Year Ended December 31, 2004
### DC Central Kitchen, Inc. and Affiliate

| | Program Services | | | | | | | | Support Services | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Food Recycling/Meal Distribution | Culinary Job Training | First Helping | Fresh Start Catering | New Beginnings | National R&D | Campus Kitchens Project | Total Programs | Management and General | Direct Donor Benefits | Development | |
| Personnel | $ 472,919 | $ 230,906 | $ 206,738 | $ 306,624 | $ 193,991 | $ 84,225 | $ 323,745 | $ 1,819,148 | $ 162,955 | $ -- | $ 165,957 | $ 2,148,060 |
| Kitchen Costs | 57,461 | 13,316 | 1,099 | 82,017 | 29,589 | -- | 1,383 | 184,865 | -- | -- | -- | 184,865 |
| Donated Kitchen Costs | 21,330 | -- | -- | -- | -- | -- | -- | 21,330 | -- | -- | -- | 21,330 |
| Food and Beverage Purchased | 25,227 | 11,489 | 1,640 | 112,028 | 305,208 | -- | 7,502 | 463,094 | -- | -- | -- | 463,094 |
| Donated Food and Beverage | 1,725,167 | 505,529 | 135,530 | -- | 15,597 | -- | 217,425 | 2,599,248 | -- | -- | -- | 2,599,248 |
| Vehicle Expense | 70,953 | -- | 15,117 | 7,006 | 7,436 | -- | -- | 100,512 | -- | -- | -- | 100,512 |
| Program Expense | 573 | 43,727 | 9,566 | -- | -- | -- | 4,771 | 58,637 | 264 | -- | -- | 58,901 |
| Donated Program Expense | -- | -- | 4,801 | -- | -- | -- | -- | 4,801 | -- | -- | -- | 4,801 |
| Events | -- | -- | -- | 299 | -- | 19,935 | 230 | 20,464 | 94 | 35,595 | 68,679 | 124,832 |
| Donated Event Expense | -- | 1,800 | -- | -- | -- | -- | -- | 1,800 | -- | 55,350 | 6,200 | 63,350 |
| Professional Services | 7,858 | 3,940 | 2,646 | 505 | 1,010 | 1,005 | 1,515 | 18,479 | 34,518 | -- | 10,893 | 63,890 |
| Donated Professional Services | 42,214 | 8,035 | 8,035 | 4,018 | 9,642 | 8,035 | 80,353 | 160,332 | 8,035 | -- | 4,018 | 172,385 |
| Internships | -- | -- | -- | -- | -- | -- | 12,500 | 12,500 | -- | -- | -- | 12,500 |
| Technology and Communications | 448 | 61 | 2,136 | 370 | -- | 3,013 | 4,526 | 10,554 | 11,056 | -- | 101 | 21,711 |
| Donated Tech. and Comm. | 13,248 | -- | 13,943 | 4,706 | -- | -- | -- | 31,897 | -- | -- | 2,963 | 34,860 |
| Depreciation | 24,883 | 1,237 | 555 | 5,890 | 6,722 | 1,452 | 1,045 | 41,784 | 4,038 | -- | -- | 45,822 |
| Building Maintenance | 250 | -- | -- | -- | -- | -- | -- | 250 | 696 | -- | 59 | 1,005 |
| Donated Rent | 168,000 | 12,000 | 21,360 | 21,600 | 21,600 | 2,400 | 92,488 | 339,448 | 9,600 | -- | 4,800 | 353,848 |
| Insurance, other than Vehicle | 400 | -- | -- | 236 | 788 | 836 | 1,048 | 3,308 | 21,796 | -- | -- | 25,104 |
| Interest and Bank Fees | 10,967 | -- | -- | 817 | 75 | -- | 90 | 11,949 | 10,440 | -- | -- | 22,389 |
| Office Expense | 2,422 | 1,898 | 1,765 | 2,309 | -- | -- | 4,247 | 12,641 | 10,450 | -- | 302 | 23,393 |
| License, Permits, and Fees | -- | 367 | -- | -- | -- | -- | 2,075 | 2,442 | 500 | -- | 6,428 | 9,370 |
| Travel and Local Business | 154 | -- | 2,831 | 1,736 | 180 | 9,908 | 10,406 | 25,215 | 1,140 | -- | 821 | 27,176 |
| Miscellaneous | 4,321 | 23 | 1,062 | 3,666 | -- | 7,286 | 1,716 | 18,074 | 2,738 | -- | 2,965 | 23,777 |
| Shared Expense Allocation | 45,782 | 11,032 | 16,547 | 19,306 | 17,651 | 4,137 | 5,599 | 120,054 | (127,992) | -- | 7,938 | -- |
| | $ 2,694,577 | $ 845,360 | $ 445,371 | $ 573,133 | $ 609,489 | $ 142,232 | $ 772,664 | $ 6,082,826 | $ 150,328 | $ 90,945 | $ 282,124 | $ 6,606,223 |

See accompanying notes.

# Consolidated Statements of Cash Flows
## For the Years Ended December 31, 2005 and 2004
### DC Central Kitchen, Inc. and Affiliate

|  | 2005 | 2004 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Change in Net Assets | $ (564,695) | $ 38,966 |
| Adjustments to Reconcile Change in Net Assets to Net Cash Used in | | |
| Operating Activities: | | |
| Depreciation | 38,212 | 45,822 |
| Donated Fixed Assets | (15,000) | |
| Loss on Disposal of Equipment | 7,333 | 1,379 |
| Changes in Assets and Liabilities: | | |
| Inventory | (459) | -- |
| Accounts Receivable | (50,372) | 6,354 |
| Contributions Receivable | 410,266 | (259,617) |
| Grants Receivable | (4,864) | 21,530 |
| Prepaid Expenses | 11,981 | 2,830 |
| Accounts Payable | 62,451 | 30,350 |
| Accrued Payroll and Leave | 13,250 | 11,817 |
| Deferred Revenue | (20,878) | 20,878 |
| Net Cash Used in Operating Activities | (112,775) | (79,691) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of Fixed Assets | (8,858) | (25,288) |
| Proceeds from the Sales of Fixed Assets | 300 | -- |
| Net Cash Used In Investing Activities | (8,558) | (25,288) |
| **Cash Flows from Financing Activities:** | | |
| Principal Payments on Capital Lease Obligations | (24,227) | (25,034) |
| Draws on Line of Credit | 1,402,400 | -- |
| Payments on Line of Credit | (1,365,400) | -- |
| Net Cash Provided by (Used in) Financing Activities | 12,773 | (25,034) |
| **Net Decrease in Cash** | **(108,560)** | **(130,013)** |
| **Cash, Beginning of Year** | **134,022** | **264,035** |
| **Cash, End of Year** | **$    25,462** | **$ 134,022** |
| **Supplemental Disclosures:** | | |
| Interest Paid in Cash | $    22,924 | $  13,904 |
| Capital Lease Obligations Incurred for use of Vehicles | $     -- | $  67,198 |

See accompanying notes.

**Notes to Consolidated Financial Statements**
**December 31, 2005 and 2004**
**DC Central Kitchen, Inc. and Affiliate**

## NOTE 1 – <u>Summary of Significant Accounting Policies</u>

<u>Entity</u>

DC Central Kitchen, Inc. (DCCK) was organized in the District of Columbia in 1988 as a not-for-profit organization for the purposes of fighting hunger and creating opportunity. DCCK serves these goals through its distinct programs: Food Recycling and Meal Distribution, Culinary Job Training, Fresh Start Catering, New Beginnings, First Helping, The Campus Kitchens Project, Inc.[sm], and National R&D.

DCCK uses food as a tool to:

- **Strengthen Bodies,** by safely recovering unserved foods from area foodservice businesses to feed children and adults at partner agencies throughout the greater Washington area.
- **Empower Minds** by providing foodservice job training for unemployed men and women and community service opportunities for youth and adults.
- **Build Communities** by providing working examples, innovative solutions, and shared technology to a cooperative and effective national network of community kitchens.

In 2002, The Campus Kitchens Project, Inc. (CKP) was incorporated as an affiliated corporation under common control with DC Central Kitchen. In 2001 and 2002 respectively, St. Louis University Campus Kitchen, LLC and Dillard University Campus Kitchen, LLC were incorporated with the Campus Kitchens Project, Inc. as the single member. In 2003, the Campus Kitchen at Northwestern University, LLC, Campus Kitchen at Augsburg College, LLC, Campus Kitchen at Marquette, LLC, and Campus Kitchen at Loyola College, MD, LLC were similarly incorporated. The Campus Kitchen at Loyola College, MD, LLC was subsequently closed in August, 2004 by mutual agreement of all parties. In 2005, the Campus Kitchen at Gonzaga University, WA was organized as an LLC with Campus Kitchen Project, Inc. as the single member and the Campus Kitchen at Dillard University, LLC was closed due to the damage from Hurricane Katrina and has not yet reopened. Each LLC is designed to operate a Campus Kitchen at a single college or university.

<u>Principles of Consolidation</u>

These financial statements include the accounts of DCCK and CKP (collectively "the Organization"). Inter-company accounts and transactions have been eliminated as part of the consolidation.

<u>Basis of Accounting</u>

The financial statements of the Organization have been prepared on the accrual basis of accounting and in accordance with standards applicable to voluntary health and welfare organizations.

<u>Cash</u>

Cash includes demand and time deposits in financial institutions. As of December 31, 2005, there are no deposits in excess of FDIC insurance limits.

<u>Inventory</u>

Inventory, consisting of disposable serving supplies and cooking ingredients, are stated at the lower of cost or market using the first-in, first-out (FIFO) method of determining cost.

## Notes to Consolidated Financial Statements
### December 31, 2005 and 2004
### DC Central Kitchen, Inc. and Affiliate

## NOTE 1 – <u>Summary of Significant Accounting Policies (continued)</u>

<u>Receivables</u>

Receivables include contributions, billings for Fresh Start Catering services, and other receivables. There are no identifiable concentrations of credit risk related to these amounts. The Organization records receivables at net realizable value using the allowance method. No allowance is provided since all receivables are deemed fully collectible.

<u>Fixed Assets</u>

Fixed Assets are recorded at cost or, for contributed assets, at estimated fair market value at the date of donation. The Organization only records fixed assets valued at $1,000, however the Organization does not capitalize donations of used computer equipment. Fixed assets are depreciated using the straight-line method over estimated useful lives of three to seven years.

<u>Accounting for Net Assets</u>

The Organization's net assets, the excess of assets over liabilities, are reported in two mutually exclusive classes:

*Temporarily Restricted.* Those net assets resulting from inflows of assets whose use is limited by donor-imposed restrictions which expire by passage of time or are fulfilled by actions of the Organization.

*Unrestricted.* Those net assets that are not temporarily restricted.

<u>Revenue Recognition</u>

*Contributions – General.* Contributions received, including unconditional promises to give, are recognized at their estimated fair values in the period received or pledged. Contributions received are reported either as unrestricted revenue or temporarily restricted revenue. The Organization reports gifts of cash and other assets as restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, that is when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported as net assets released from restrictions. However, contributions that are restricted by a donor are reported as increases in unrestricted net assets if the restrictions expire in the same fiscal year in which the contributions are recognized.

*Contributions – Space.* The Organization receives the rent-free use of kitchen facilities, office space, and dry storage. These in-kind contributions and the related rental expense of $372,796 and $353,848 for the years ended December 31, 2005 and 2004, respectively, are reflected in the accompanying consolidated financial statements based on management's estimate.

*Contributions – Services.* The Organization recognizes certain contributed services as revenue and expense if such services require specialized skills, are provided by individuals possessing those skills, and would typically need to be purchased if not donated. The Organization receives contributed services from a large number of volunteers that do not meet the criteria for recognition. The fair value of these services is not practical to estimate.

*Contributions – Food.* The Organization has received millions of pounds of food since its inception in 1989. Management used certain estimates and assumptions to determine the value of approximately 1.43 million and 1.58 million pounds of food for the years ended December 31, 2005 and 2004, respectively.

*Government Grants.* Government grants consist primarily of cost reimbursement contracts. Revenues are recognized when the Organization incurs allowable costs.

**Notes to Consolidated Financial Statements**
**December 31, 2005 and 2004**
**DC Central Kitchen, Inc. and Affiliate**

## NOTE 1 – <u>Summary of Significant Accounting Policies (concluded)</u>

***Retail Food.*** Retail food sales of Fresh Start Catering are recognized when the food is delivered. Any cash received from customers prior to delivery is reported as deferred revenue.

<u>Expense Allocation</u>

The Organization's expenses have been summarized on a functional basis in the statement of activities. Accordingly, certain indirect costs have been allocated among the programs and supporting services benefited as detailed in the consolidated statements of functional expenses.

<u>Use of Estimates</u>

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could vary from the estimates that were used.

<u>Income Taxes</u>

The Organization consists of separate not-for-profit corporations, exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code (the Code). Therefore, these financial statements contain no provision for federal income taxes. DCCK has been designated as a "publicly supported" organization under Sections 509(a)(1) of the Code, and CPK has been designated as a "supporting organization" under Sections 509(a)(3) of the Code. Therefore, both entities are eligible to receive tax deductible contributions.

## NOTE 2 – <u>Functional Expenses</u>

The costs of conducting the Organization's program services and other activities have been summarized on a functional basis.

***Food Recycling and Meal Distribution.*** In 2005 and 2004, hotels, restaurants, and other foodservice businesses donated approximately 1.43 million and 1.58 million pounds, respectively, of food to DCCK. A team of chefs, trainees, and volunteers used this food to create meals that were donated and delivered to more than 100 social service agencies throughout the Washington metropolitan area. Agencies receiving meals include homeless shelters, community and youth centers, children's after-school programs, senior centers, and others. In addition, DCCK provided these agencies with supplemental food and snacks for children's after-school programs. During the summer school break, DCCK places a special focus on providing meals to agencies that serve children, thereby enabling them to receive balanced meals while the school lunch program is not available. Partner agencies can concentrate their resources on the valuable services they offer by serving meals provided by DCCK.

Healthy Returns is a new program of the Organization focused on feeding our young people healthier foods that will help develop life-long improved eating habits. The program's goal is to enable DC agencies to encourage our youth to eat better and lead healthier lives by consistently providing more substantial, kid friendly foods. Healthy Returns will distribute healthier, more substantial snacks to agencies serving low-income children and at-risk youth and well-balanced meals to agencies serving struggling families across the Washington Metropolitan Area. Not only will the children be provided healthier food, but they will also receive nutritional education. The invaluable information that they will be taught will allow the students the power to make smarter food and health choices.

Notes to Consolidated Financial Statements
December 31, 2005 and 2004
DC Central Kitchen, Inc. and Affiliate

## NOTE 2 – Program Services (continued)

*Culinary Job Training.* DCCK operates a successful twelve week Culinary Job Training program for unemployed men and women living in homeless shelters or receiving welfare benefits. The program offers comprehensive training in food preparation and sanitation in combination with job readiness and life skills training. The program is designed to train up to twenty five people in each twelve week cycle, providing four cycles per year.

DCCK's training program received support from the Department of Housing and Urban Development (HUD). HUD funds are authorized under Title IV of the Stewart B. McKinney Homeless Assistance Act.

*First Helping.* First Helping is a street-level outreach project of DCCK that serves men and women who are homeless and living on city streets or in the City's emergency shelters. First Helping provides breakfast each weekday throughout the year at three DC locations allowing DCCK to develop contacts with clients and providing opportunities to refer clients to a continuum of care provided by the City's social services and other care providers.

DCCK is one of three programs in the District providing citywide food services as part of Phase 21 of the Federal Emergency Management Agency's Emergency Food and Shelter National Board Program.

*Fresh Start Catering.* Fresh Start Catering is a full-service, professional catering company that employs graduates of DCCK's job training program. With Fresh Start, graduates build on the skills they acquired in the Culinary Job Training program with opportunities to learn advanced culinary skills, presentation techniques, and formal service that will enable them to obtain jobs in the competitive hospitality industry. This program supports DCCK's training program by creating an ongoing, repetitive cycle of training and employment.

*New Beginnings/Contract Foods.* In addition to providing donated meals and supplemental food products to social service agencies, DCCK has entered into service contracts for clients seeking a more formal or specialized relationship. In 2005, these clients included the District of Columbia Family Shelter at DC Village, Families Forward Hypothermia Unit at DC General, Center for Mental Health, and Washington Jesuit Academy. New York Avenue Presbyterian Church, Sarah's Circle, and Tyler House, three agencies providing services to senior citizens, also received meals provided by New Beginnings in 2005. New Beginnings hires graduates of DCCK's Culinary Job Training Program and provides specialized training in high-volume meal production.

*National R&D.* DCCK believes that it is important to promote not just the activities of DCCK, but the ideals that drive its mission. To carry out this effort DCCK's president travels to universities, colleges, and speaks in communities around the country to discuss issues of homelessness, nonprofit management, responsible civic leadership and social entrepreneurship.

Kitchens In National Cooperation[sm] (Kitchens INC) is a nationwide collaboration of community-based kitchens like DCCK. Using an interactive web forum, kitchens from the United States and around the world in various stages of development or operation can work together to improve their programs. Using tools such as interactive discussion boards, an online training manual, and live chats, Kitchens INC allows more than 60 organizations nationwide the opportunity to share information in a way that has no financial cost, is up-to-date, and is specifically geared toward this unique group of organizations that share a common goal. Kitchens INC also hosts an annual conference for community kitchen's staff and graduates to share ideas, best practices, and gather resources.

**Notes to Consolidated Financial Statements**
**December 31, 2005 and 2004**
**DC Central Kitchen, Inc. and Affiliate**

## NOTE 2 – <u>Program Services (concluded)</u>

*Campus Kitchens Project, Inc.*[sm]  The Campus Kitchens Project, Inc. is a nationwide program that has opened, staffed, and supported DCCK-style community kitchens in university or college settings. The pilot site of the Campus Kitchens Project[sm] at Saint Louis University was opened in October 2001. The project is a collaborative venture between DCCK, the university dining contractor, and the university. Food is donated from campus dining facilities, re-prepared by student volunteers and then distributed, by students, to social service agencies and individuals located in the immediate community. In November 2002 a second site was opened at Dillard University in New Orleans. This site sustained substantial damage from Hurricane Katrina, and has not yet reopened. Today The Campus Kitchens Project is active at five locations, including Saint Louis University, Northwestern University outside of Chicago, Marquette University in Milwaukee, Augsburg College in Minneapolis, and Gonzaga University in Spokane.

*Management and General.*  The costs include all expenses required to conduct the affairs of the Organization that are not attributable to other functional areas.

*Direct Donor Benefits.*  The Organization holds one significant fundraising event each year – the Capital Food Fight. The direct benefits to donors include the costs of meals and facilities rented for the event.

*Development.*  These are the costs of all fundraising activities including the costs of the Capital Food Fight event that are not classified as direct donor benefits.

## NOTE 3 – <u>Contributions Receivable</u>

Contributions receivable represent unconditional promises to give and are stated at their net realizable value. Amounts expected to be collected in less than one year total $242,750 and $453,016 for the years ended December 31, 2005 and 2004, respectively. Amounts expected to be received in one to five years total $125,000 and $325,000 for the same periods.

## NOTE 4 – <u>Line of Credit</u>

DCCK has a line of credit with Bank of America which provides for borrowing up to $250,000 at their prime rate, which was 7.75% at December 31, 2005. The line of credit is secured by inventory, receivables and equipment and expires on July 20, 2006. As of December 31, 2005 and 2004, the line had an outstanding balance of $37,000 and $0, respectively.

## Notes to Consolidated Financial Statements
### December 31, 2005 and 2004
### DC Central Kitchen, Inc. and Affiliate

## NOTE 5 – Capital Lease Obligations

DCCK has three non-cancelable capital lease agreements for vehicles. Interest rates range from 15.5% to 20.8%. The capitalized amount of $106,771 is included in vehicles with related accumulated depreciation of $62,497 at December 31, 2005. The future minimum lease payments for the years ending December 31 are as follows:

| Year Ending | Amount |
|---|---|
| 2006 | $ 26,093 |
| 2007 | 20,140 |
| 2008 | 20,140 |
| 2009 | 11,012 |
| Less: amount representing interest | (21,441) |
| Capital Lease Obligations | $ 55,944 |

## NOTE 6 – Temporarily Restricted Net Assets

Temporarily restricted net assets consist of the unreceived portion of unconditional promises to give from the following:

| | |
|---|---|
| Sodexho Foundation – to be received in two payments of $125,000; June, 2006 and June, 2007. | $250,000 |
| UPS Foundation – final payment of a three-part contribution to be received in April, 2006. | 75,000 |
| Totals | $325,000 |

## NOTE 7 – Prior Period Adjustments

The following adjustments were made in the financial statements for the year ended December 31, 2004. In both cases, expenses were reallocated between functional classifications. These changes had no effect on net assets or the change in net assets.

- A portion of Donated Food and Beverage expenses was reclassified from Food Recycling/Meal Distribution to Culinary Job Training.

- A portion of Events and Donated Event Expenses was reclassified from Development Expenses to Direct Donor Benefits.

**Supplemental Information**

# Schedule of Consolidated Summary of Functional Expenses
## For the Year Ended December 31, 2005
## DC Central Kitchen and Affiliate

| | Program Services | | | Consolidated Support Services | | | |
| | DCCK Programs | Campus Kitchens Project | Total Consolidated Programs | Management and General | Direct Donor Benefits | Development | Total Consolidated |
|---|---|---|---|---|---|---|---|
| Personnel | $ 1,571,851 | $ 277,994 | $ 1,849,845 | $ 197,842 | $ | $ 148,804 | $ 2,196,690 |
| Kitchen Costs | 203,900 | 3,077 | 206,977 | -- | -- | -- | 206,977 |
| Donated Kitchen Costs | 3,833 | -- | 3,833 | -- | -- | -- | 3,833 |
| Donated Equipment | 1,500 | -- | 1,500 | -- | -- | -- | 1,500 |
| Food and Beverage Purchased | 509,636 | 14,130 | 523,766 | 222 | -- | -- | 523,988 |
| Donated Food and Beverage | 2,202,304 | 210,888 | 2,413,192 | -- | -- | -- | 2,413,192 |
| Vehicle Expense | 99,312 | 71 | 99,383 | 69 | -- | -- | 99,452 |
| Donated Vehicle Expense | 1,347 | -- | 1,347 | -- | -- | -- | 1,347 |
| Program Expense | 55,836 | 16,101 | 71,937 | -- | -- | -- | 71,937 |
| Donated Program Expense | 4,860 | -- | 4,860 | -- | -- | -- | 4,860 |
| Events | 1,704 | 343 | 2,047 | 125 | 18,317 | 96,319 | 116,808 |
| Donated Event Expense | 1,200 | -- | 1,200 | -- | 55,000 | 58,850 | 115,050 |
| Professional Services | 24,505 | 1,265 | 25,770 | 80,956 | -- | 3,381 | 110,107 |
| Donated Professional Services | 31,839 | 36,164 | 68,003 | 2,766 | -- | 1,559 | 72,328 |
| Internships | -- | 15,360 | 15,360 | -- | -- | -- | 15,360 |
| Technology and Communications | 3,103 | 2,951 | 6,054 | 12,700 | -- | 1,184 | 19,938 |
| Donated Tech. and Communications | 3,565 | -- | 3,565 | 310 | -- | 175 | 4,050 |
| Depreciation | 36,210 | 62 | 36,272 | 1,940 | -- | -- | 38,212 |
| Building Maintenance | 191 | -- | 191 | 1,906 | -- | -- | 2,097 |
| Donated Rent | 250,380 | 102,322 | 352,702 | 11,595 | -- | 6,795 | 371,092 |
| Donated Storage Space | 1,704 | -- | 1,704 | -- | -- | -- | 1,704 |
| Insurance, other than Vehicle | 5,216 | 3,547 | 8,763 | 18,774 | -- | -- | 27,537 |
| Interest and Bank Fees | 15,330 | -- | 15,330 | 11,408 | -- | 4,317 | 31,055 |
| Office Expense | 10,620 | 4,069 | 14,689 | 37,287 | -- | 15,674 | 67,650 |
| Travel and Local Business | 9,688 | 14,340 | 24,028 | 952 | -- | 726 | 25,706 |
| Miscellaneous | 11,793 | 3,613 | 15,406 | 6,429 | -- | 1,625 | 23,460 |
| Shared Expense Allocation | 78,350 | 4,405 | 82,755 | (86,607) | -- | 3,852 | -- |
| | $ 5,139,777 | $ 710,702 | $ 5,850,479 | $ 298,674 | $ 73,317 | $ 343,261 | $ 6,565,731 |

- 14 -

*07-198
RMC*

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I. (a) PLAINTIFFS

Francwa Sims

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  11001
(EXCEPT IN U.S. PLAINTIFF CASES)

Pro se N/a

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

### DEFENDANTS

Catholic Charities, et al.,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

CASE NUMBER   1:07CV00198

JUDGE: Rosemary M. Collyer

DECK TYPE: Civil Rights (non-employm

DATE STAMP: 01/30/2007

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

### III CITIZEN...
FOR PLAINTIF...

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ☐ E. General Civil (Other)  OR  ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (If not administrative agency review or Privacy Act

| ☐ G.  *Habeas Corpus/*<br>*2255*<br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ H.  *Employment*<br>*Discrimination*<br>☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ I.  *FOIA/PRIVACY*<br>*ACT*<br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ J.  *Student Loan*<br>☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |
|---|---|---|---|
| ☐ K.  *Labor/ERISA*<br>*(non-employment)*<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ L.  *Other Civil Rights*<br>*(non-employment)*<br>☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ M.  *Contract*<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ N.  *Three-Judge Court*<br>☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**V. ORIGIN**

☒ 1 Original    ☐ 2 Removed    ☐ 3 Remanded from    ☐ 4 Reinstated    ☐ 5 Transferred from    ☐ Multi district    ☐ 7 Appeal to
Proceeding    from State    Appellate Court    or Reopened    another district    Litigation    District Judge
Court    (specify)    from Mag.
Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

**VII. REQUESTED IN**    CHECK IF THIS IS A CLASS    **DEMAND $**    Check YES only if demanded in complaint
**COMPLAINT**    ☐    ACTION UNDER F.R.C.P. 23    0    **JURY DEMAND:**  ☐ YES    ☒ NO

**VIII. RELATED CASE(S)**    (See instruction)
**IF ANY**    ☐ YES    ☒ NO    If yes, please complete related case form.

DATE  1.30.07    SIGNATURE OF ATTORNEY OF RECORD
NCD

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

